[Civil No. 2186.  Filed July 21, 1923.]

[217 Pac. 935.]

# JOHN P. ORME, Appellant, v. SALT RIVER VALLEY WATER USERS' ASSOCIATION, a Corporation, Appellee.

1. CORPORATIONS — MEETINGS AT SEVERAL PLACES OR POLLING PRECINCTS HELD NOT A STOCKHOLDERS' "MEETING" WITHIN STATUTE.— An election whereat stockholders vote at several polling precincts on corporate matters is not a "meeting" within the meaning of Civil Code of 1901, paragraph 771, section 11, providing corporations may be renewed from time to time for not more than twenty-five years, when three-fourths of the votes cast at any stockholders' "meeting" for that purpose shall be in favor of such renewal, and this in spite of Civil Code of 1913, paragraph 5552, as to singular and plural number.

2. CORPORATIONS — STOCKHOLDER WHO AGREED TO PROVISIONS IN ARTICLES OF INCORPORATION HELD NOT ENTITLED TO QUESTION VALIDITY OF ELECTION TO RENEW CORPORATION PURSUANT THERETO.— A stockholder in a water users' corporation, who by his predecessor in interest has agreed to all provisions of the articles of incorporation, among which provisions is one providing that all action taken by stockholders shall be at an election and not referring to a stockholders' meeting, and thus subjected his land and stock thereto, cannot question the validity of a renewal of the corporation by an election instead of a stockholders' meeting as provided for by Civil Code of 1901, paragraph 771, section 11.

3. CORPORATIONS—STOCKHOLDERS' MEETING TO VOTE ON RENEWAL OF CORPORATION PROVIDED FOR BY STATUTE MAY BE CHANGED TO ELECTION BY AGREEMENT.—The provision in Civil Code of 1901, paragraph 771, section 11, for renewal of a corporation "at any stockholders' meeting called and held for that purpose," may be waived or changed for a better method, as an election, though provisions relating to the number of years and the percentage of affirmative votes necessary cannot be changed, since they relate to public policy.

4. CORPORATIONS—STOCKHOLDERS' LONG ACQUIESCENCE IN MANNER OF VOTING AND HOLDING OF ELECTIONS, RATHER THAN STOCKHOLDERS' MEETING, PRECLUDES OBJECTION.—A stockholder who acquiesces in method of corporate operation in matter of voting and of holding elections, rather than of holding stockholders' meetings, for more than twenty years, cannot thereafter assert that such elections were invalid and improper means of expressing the popular will.

5. CORPORATIONS — LIMITATION IN ARTICLES OF INCORPORATION ON STOCKHOLDERS' RIGHT TO VOTE HELD NOT ELIMINATED BY SUBSEQUENTLY ENACTED STATUTE PROHIBITING SUCH LIMITATIONS.—The provisions in the articles of incorporation organized before Civil Code of 1913, paragraph 2115, was enacted denying a right to vote to stock owned by corporations, guardians, executors, administrators, trustees and persons under twenty-one years of age, and denying the right to vote cumulatively and by proxy, does not render its election invalid, notwithstanding the provisions of that statute later enacted prohibiting such limitations.

6. WATERS AND WATERCOURSES—IRRIGATION CORPORATION HELD INCIDENTALLY EMPOWERED TO CONSTRUCT ADDITIONAL DAM TO AID IN POWER DEVELOPMENT.—It is within the incidental powers of a corporation organized primarily for irrigation purposes, but authorized to construct power houses and transmission lines, and to create, transmit and use power for the accomplishment of its purposes, also to install in the river, below its reservoir, a second dam, for the purpose of catching water released from above and using it again to develop power, thus enabling the association to furnish power throughout the year and to secure a more advantageous market than would otherwise have been possible.

7. WATERS AND WATERCOURSES—AMENDMENT TO ARTICLES OF INCORPORATION SPECIFICALLY CONFERRING POWER ALREADY POSSESSED INCIDENTALLY NOT REQUIRED TO BE ADOPTED BY MAJORITY STOCKHOLDERS.—An amendment to the articles of incorporation of an irrigation association conferring on it the specific power to do a thing it could have done incidentally before, namely, constructing an additional dam for development purposes, is not within Civil Code of 1901, paragraph 770, section 10, Civil Code of 1913, paragraph 2102, required to be adopted by an affirmative vote of a majority of the stockholders, since it related neither to the names of the corporators, the corporate name, place of business nor nature of proposed business.

8. CORPORATIONS — ARTICLES OF INCORPORATION CONTROL EXCEPT IN MATTERS COVERED BY STATUTE.—Provisions in articles of incorporation contrary to the statute must give way to that extent, but in respect to those matters to which the statute does not apply the articles of incorporation control.

9. CORPORATIONS—BOND ISSUE IN EXCESS OF STATUTORY LIMIT ON INDEBTEDNESS HELD VALIDATED BY CURATIVE ACT.—Where stock-

5. Validity of agreement to control the voting power of corporate stock, see notes in 14 Ann. Cas. 938; Ann. Cas. 1918E, 252; 15 L. R. A. 683; 16 L. R. A. (N. S.) 1136; 31 L. R. A. (N. S.) 1186. See 12 C. J., p. 1091; 14 C. J., pp. 180, 185, 187, 886, 887, 898; 14A C. J., pp. 546, 574, 612, 658; 36 Cyc. 1193; 40 Cyc. 826.

holders of a corporation capitalized at $3,750,000 adopted an
amendment to its articles of incorporation authorizing an indebt-
edness equal to two-thirds of its capital stock exclusive of
$9,000,000, which it already owed the United States government,
and at the same time voted a bond issue of $1,800,000 in disre-
gard of the statutory limitation on corporate indebtedness,
*held*, that such bond issue was validated, if at first questionable,
by the curative act, House Bill No. 1, enacted February 13, 1923
(Laws 1923, c. 4); such act being clearly within the authority
of the legislature.

10. STATUTES—LEGISLATURE HELD TO HAVE COMPLIED WITH CONSTITU-
TION IN EMERGENCY CLAUSE.—Under Constitution, article 4, part
1, section 1, reserving the right of referendum but permitting the
passage of immediately effective emergency measures when neces-
sary "for the preservation of public peace, health or safety, or for
the support and maintenance of the departments of the state
government and state institutions," and requiring the legislature
in a separate section to declare why it is necessary that such
legislation shall become immediately effective, the section declar-
ing existence of an emergency need not declare the reasons why
it exists, and House Bill No. 1 enacted February 13, 1923 (Laws
1923, c. 4), section 3, declaring "the provisions of this act are
necessary for the . . . public peace, health and safety, an emer-
gency is hereby declared to exist," is a sufficient compliance to
validate the act.

11. CORPORATIONS—AMENDMENT TO ARTICLES OF INCORPORATION HELD
SUFFICIENTLY ADOPTED, THOUGH AFFIRMATIVE VOTES CAST WERE
LESS THAN A MAJORITY OF ALL ISSUED AND OUTSTANDING STOCK.
An amendment to the articles of incorporation of a water users'
association adopted at an election, whereat a majority of the
stockholders voted, by a vote of more than 14 to 1, *held* sufficiently
adopted within the meaning of House Bill No. 1 enacted February
13, 1923 (Laws 1923, c. 4), though the affirmative vote cast did
not constitute a majority of all the issued and outstanding stock.

12. CORPORATIONS — CORPORATION AUTHORIZED TO CONTRACT DEBT IM-
PLIEDLY AUTHORIZED TO ISSUE BONDS.—The water users' associa-
tion, whose articles of incorporation contain a provision limiting
its indebtedness, *held* impliedly authorized to issue bonds to cover
any corporate indebtedness legally incurred, since the power to
issue bonds is a necessary incident to the power to contract a
debt.

13. WATERS AND WATERCOURSES—ONE ASSESSMENT TO PAY FOR PAR-
TICULAR IMPROVEMENT SPECIFYING ANNUAL PAYMENTS MAY BE
MADE IN PLACE OF YEARLY ASSESSMENTS FOR AMOUNT THEN DUE
AND PAYABLE.—Where the interest from the beginning on an in-
debtedness incurred by a water users' association for a particular
improvement and a certain proportion of the principal each year

after fifteen years shall have elapsed is to be paid annually, one assessment for the full amount of such indebtedness specifying the proper annual payments by the stockholders may be levied.

14. WATERS AND WATERCOURSES — WITHIN IMPLIED POWER OF BOARD AUTHORIZED TO INCUR INDEBTEDNESS TO ISSUE TRUST DEED TO SECURE IT.—Where shareholders of an incorporated water users' association have authorized a particular indebtedness and empowered the board of governors to incur such indebtedness, it is within the implied powers of that board to issue a trust deed by which the assessments levied against the lands of the shareholders will be assigned to a trustee to secure the payment of the principal and interest on such bonds.

APPEAL from a judgment of the Superior Court of the County of Maricopa. F. C. Struckmeyer, Judge. Affirmed.

Messrs. Townsend, Stockton & Drake, for Appellant.

Messrs. Kibbey, Bennett, Gust & Smith, for Appellee.

McALISTER, C. J.—This action was brought to enjoin the Salt River Valley Water Users' Association from carrying out a contemplated improvement designated as Mormon Flat development No. 1 and to have declared void a proposed bond issue by the association of $1,800,000 in furtherance of it. The trial court refused the relief prayed for, and the plaintiff, John P. Orme, a stockholder in the association, appeals.

Appellee is a corporation organized under the laws of the territory of Arizona on February 9, 1903, for the purpose of providing an adequate supply of irrigation water for the 250,000 acres of land lying within what is known as the Salt River project in this state, by diverting, impounding, developing and pumping water and distributing it to said lands, and by creating, transmitting and issuing power to aid therein. Congress had passed on June 17th of the

previous year the Reclamation Act, and it was contemplated when the articles of incorporation were adopted that the United States government would construct under its provisions a dam and reservoir on Salt River, in this state, to store water for irrigating the lands conveniently susceptible of irrigation from that source, and to secure action by or aid from the government in building such works as a means towards accomplishing the general purpose of the corporation the articles empowered it to make any contract or arrangement deemed proper, and especially to enter into any agreement with the United States government which might be approved by the Secretary of the Interior or his duly authorized representative relating to the collection and payment to the government of any moneys due it for rights issued by it to members of the association for the use of water from any reservoir or irrigation works acquired or constructed by it. They further authorized the association to comply with any rules or regulations prescribed by Congress or the proper official of the government in reference to the storage or use of water impounded, developed or delivered by it.

The association was organized under the ordinary corporation laws of this state and its articles worked out by the joint effort of the land owners under the proposed project, who were its stockholders, and the officials of the United States Reclamation Service whose duty it was to administer the reclamation law. Membership in the association was limited to the owners of irrigable land lying within the Salt River reservoir district whose exterior boundaries were described in the articles and each owner permitted to subscribe for one share of stock for each acre of land owned by him and no more. His stock entitled him to water for his land to which the water rights represented thereby were made inseparably appurtenant, and each stockholder was required by agreement in

writing to subscribe to the articles of incorporation and to declare that he agreed to be bound by their provisions.

The exercise of the corporate powers and the management of the affairs of the corporation were vested in a council of thirty members, which was empowered to enact by-laws and make rules and regulations for its government, a board of governors of eleven members, including the president of the association, whose duty it was to manage, conduct and administer its affairs subject to the provisions of the articles and by-laws, local boards of water commissioners, a president, vice-president, treasurer and secretary. For the purpose of electing members of the council, the Salt River reservoir district was divided into ten districts, from each of which is elected three members of the council and one member of the board of governors, and at elections for these officers or for any other purpose the votes are cast at the various voting precincts throughout the district by the electors in person at the polls by written or printed ballot; each elector or shareholder being entitled to one vote to each share of stock owned by him, not, however, to exceed in the aggregate 160 votes. To be a qualified voter at such an election, the articles require that one be at the time the owner of at least one share of the capital stock of the association and that he shall have been such owner, according to the books of the company, for at least twenty days prior thereto, of the age of twenty-one years or more, and of sound mind.

The articles provide that revenue for corporate purposes shall be raised by levying assessments upon the shareholders, and that such assessments when levied shall become, be and remain until paid a lien on the lands of the shareholders against which they are levied and the stock appurtenant thereto, but that an indebtedness to exceed $50,000 (later raised by amendment to $100,000), except for ordinary op-

eration, maintenance and repair, may not be incurred in any one year unless it be ratified by at least two-thirds of the votes cast at an election called for that purpose, and in no event may the corporate indebtedness exceed two-thirds of the capital stock. The articles provide that the corporation shall endure for twenty-five years, and there is no provision for its renewal or extension; but there is one permitting amendment of the articles by the shareholders at a regular, annual election, or a special one duly called for that purpose.

It appears from the complaint that the aim and object of the association at the time of its organization has been largely accomplished; that the owners of more than 200,000 acres of land in the Salt River reservoir district have become shareholders and by instruments in writing have obligated their lands in the said district to be bound by the provisions of the articles of incorporation and the rules and regulations of its by-laws; that on June 25, 1904, the association entered into a contract with the United States providing for co-operation between the association and its shareholders and the United States government in the construction of a reservoir on Salt River, which reservoir was constructed and has been in operation since 1910 and is known as the Roosevelt reservoir; that a highly developed irrigation system has been constructed for the benefit of the lands of the association's shareholders and was operated by the United States Reclamation Service up to September 6, 1917, when the United States government and the association, after its stockholders at an election held for that purpose had authorized such action, entered into a further contract by which the operation, maintenance and control of said irrigation system were vested in said association upon the terms therein provided, subject, however, to be terminated by either party in the manner therein stated, and the payment

of the construction charges amounting to $10,166,-021.97 due the United States, of which $9,278,091.31 were unpaid when the bonds were authorized, was assumed by the association; that under said contract the association has, since October, 1917, operated and maintained, and is now operating and maintaining, the aforesaid irrigation works, and during this time has under its articles and by-laws levied and collected assessments upon the lands of its shareholders to pay for operation and maintenance, for the construction charges of the United States, and for the improvements, additions and betterments of the said works made from time to time by the association.

It is further alleged that before the management of the irrigation system was taken over by the association the United States had constructed as incidental thereto, with funds of both the government and the association, a hydroelectric power system, at a cost of practically $4,500,000, by which the waters of the reservoir are made to produce power to be used by the association for these purposes: To pump water from underground sources to supplement the reservoir supply in times of shortage; to drain the lands of its shareholders by pumping surplus waters therefrom; to supply electric power to the farms of its shareholders; and to sell for mining, municipal and pumping purposes in order to raise revenue to enable the association to pay the cost of construction of the reservoir and other works; that to protect this investment, and increase the revenue therefrom and to some extent the amount of water available for irrigation, the shareholders of the association at a special election held for that purpose on January 4, 1923, approved by a vote of more than 14 to 1, though less than one-half of the stock outstanding was voted, the following five propositions, viz.:

(1) The construction of the improvement designated as Mormon Flat development No. 1.

(2) The issuance of the bonds of the association in the sum of $1,800,000 to finance the same.

(3) The levying of an assessment upon the lands of the shareholders at the time of the issuance of said bonds to assure the payment of the interest and principal of such bonds as they become due.

(4) The amendment of the articles of incorporation of the association so as to extend the term of its corporate life for a period of twenty-five years from the date of such amendment.

(5) Amendment of the articles so as to authorize an indebtedness of two-thirds of its capital stock exclusive of the amount due the United States government and assumed by the association.

It appears also that the action of the association on these propositions was approved by the Secretary of the Interior on February 2, 1923, who at the same time declared that if the United States ever took back the management and operation of the project it would give the bonds the same recognition the association will be required to give them if it continues in charge of the project; that the association through its proper officers, after duly advertising said bonds, has entered into an agreement to sell them, and intends to prepare and issue its six per cent negotiable bonds in the aggregate sum of $1,800,000, payable from fifteen to twenty-five years from date of issuance, and also to levy and cause to be recorded in the office of the county recorder of Maricopa county, Arizona, in which the said lands are situated, an assessment of sixty cents per acre each year for fifteen years and of a proportionately reduced amount for the remaining ten years to pay the interest, and of $1 per acre each year beginning

fifteen years from this date to the end of twenty-five years to pay the principal, of said bond.

The complaint alleges that these bonds are and will be wholly void, and gives a number of reasons therefor, but the answer denies each of these, and in addition pleads certain affirmative matter; but it is unnecessary to state these respective allegations here, as they will appear in connection with a discussion of the various rulings of the court upon which error is based. These grow out of a difference in construction of various provisions of the articles of incorporation and certain provisions of the statute relating thereto, but there is no dispute as to the facts applicable to any of them.

The first contention is that the court erred in rendering judgment for appellee because under the original articles of incorporation its corporate life will expire February 9, 1928, and the purported amendment extending its life adopted at the election held January 4, 1923, was and is void for the reason that such election was not a stockholders' meeting within the meaning of paragraph 771, Revised Statutes of 1901, reading as follows:

"771. (Sec. 11) Corporations organized under this title may be formed to endure for twenty-five years, but they may be renewed from time to time for a period of not exceeding twenty-five years, when three-fourths of the votes cast at any stockholders' meeting duly  called and held for that purpose shall be in favor of such renewal."

This paragraph was in force when the Water Users' Association was incorporated, and under its provisions, literally construed, the amendment could have been adopted only by three-fourths of the stockholders voting in its favor at a stockholders' meeting, duly called and held for that purpose; but appellee contends that while the word "meeting," when used in this connection, ordinarily and commonly signifies

a coming together of the stockholders at some designated place for the purpose of discussing and deciding corporate matters requiring their action, it is nevertheless sufficiently elastic in meaning to be applied to an election such as that held by the Water Users' Association, and that under paragraph 5552, Revised Statutes of 1913, providing that in construing statutes the singular number shall include the plural and the plural the singular, the holding of elections in several polling precincts is simply holding several meetings instead of one. In support of this view, it cites two cases in which the word "meeting" has been applied to an election, namely, *In re Foley,* 8 Misc. Rep. 57, 28 N. Y. Supp. 608, and *Commonwealth* v. *Desmond,* 122 Mass. 12; but the following which deal altogether with stockholders' meetings are to the contrary: *Finley Shoe & Leather Co.* v. *Kurtz,* 34 Mich. 88; *De La Vergne etc. Co.* v. *German Savings Inst.,* 175 U. S. 40, 44 L. Ed. 65, 20 Sup. Ct. Rep. 20 (see, also, Rose's U. S. Notes); *Peirce* v. *New Orleans Building Co.,* 9 La. 397, 29 Am. Dec. 448; *Demarest* v. *Spiral Riveted Tube Co.,* 71 N. J. L. 14, 58 Atl. 161; *Nicholstone City Co.* v. *Smalley,* 21 Tex. Civ. App. 210, 51 S. W. 527; *Commonwealth* v. *Cullen,* 13 Pa. 133, 53 Am. Dec. 450.

The real basis of this claim, however, is that in view of the nature of the corporation concerned an election would much more completely effectuate the purpose and intent of the statute, that is, obtain a fuller and fairer expression of those interested and voting, than a stockholders' meeting possibly could, for the reason that a meeting composed of several thousand people would render impracticable a proper discussion of any proposition and seriously handicap by its size and unwieldy nature intelligent action of any kind, and to get together the necessary number of such stockholders whose homes are scattered over

an area of approximately 200,000 acres would be very difficult if not impossible. As applied to the facts and circumstances of this particular case, this contention may possess merit; but we find it unnecessary to determine it in view of the fact that appellant is not in a position to question it regardless of its correctness, because his predecessor in interest, at the time his stock was applied for, subscribed and agreed to all the provisions of the articles of incorporation of the association, and thus subjected his land and stock thereto, and among these provisions is one stating that all action taken by the shareholders shall be at an election, no reference whatever being made to a stockholders' meeting.

This provision seems to have been born of the necessities of the occasion. The conditions confronting the incorporators of the association at that time were unusual. It was greatly desired that a mutual irrigation corporation, *quasi* public in character, be formed, and that the land owners of the Salt River Valley, whose number then was several thousand, but which it was known would greatly increase upon the accomplishment of the purpose of the corporation, would become stockholders therein, and the only law under which they could organize was the ordinary corporation law of the state (then territory), which, literally construed, required all action taken by shareholders to be at a stockholders' meeting. Realizing, however, that a meeting of so many persons for the transaction of business would not be practicable, they agreed upon and provided for elections in its stead, and in so doing waived this provision. It is contended, however, that it is mandatory and cannot be waived, but a liberal construction of it—and the facts of this case call for such an interpretation—would hardly classify it as such, because there is no reason why, in a corporation of this character, the manner

in which the statute provides the preference of stock-holders on the question of renewal shall be made known may not be changed by agreement of all the stockholders to a method better suited to accomplish this purpose, though such would not be true of the provisions giving the number of years for which corporate franchises may be granted by the state or renewed by the stockholders, or the percentage of the latter favoring renewal before it should become effective, because these declare the public policy of the state on the questions involved and cannot be waived. *Smith* v. *Eastwood Wire Mfg. Co.,* 58 N. J. Eq. 331, 43 Atl. 567. In discussing mandatory and directory statutes, Judge Cooley, in his Constitutional Limitations, 7th ed., p. 113, used this language:

"Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute."

The manner in which the shareholders express themselves on the question of renewal is not of the essence of this provision, but is inserted for the purpose of providing a "proper, orderly and prompt" way of obtaining the views of the stockholders on this proposition, and there can be no question but that elections by a corporation of this character accomplish the substantial purpose of the statute providing for stockholders' meetings and that the rights of no one interested are prejudiced thereby.

Up to this time it has evidently been the view of everyone acquainted with the purpose and operat-

ing method of the association that this is true, for
the plan of holding elections instead of meetings upon
all matters calling for action by the stockholders
has been followed for over twenty years without
question from any source, no person interested in
the association or any official of the state or national
government having raised any objection to it, and
the attempt to do so now comes too late. No stock-
holder with full knowledge of the association's method
of operation in this respect could acquiesce therein
for so many years and then be heard to complain.
If he thought the elections held by the association
were not permissible under the statute, he should
have objected years ago, for "long-continued acquies-
cence in a course of conduct by one interested in it,
especially when the rights of others are affected
thereby, will induce the court to refuse him relief
upon his subsequent complaint of it." *Dunphy* v.
*Travelers' Newspaper Assn.*, 146 Mass. 495, 16 N. E.
426. And we see no reason why this should not
apply to the state also.

The validity of the amendment extending the life
of the corporation and of all other amendments voted
on since the organization of the corporation, as well
as the various propositions submitted from time to
time and carried, including those of January 24,
1923, is attacked upon the ground that the elections
at which they were approved were illegal and void
for the reason that the stock owned and held by
corporations, guardians, executors, administrators,
trustees and persons under twenty-one years of age,
was prohibited from voting, and for the further
reason that the right to vote cumulatively and by
proxy was denied the shareholders. This contention
is based on the provisions of paragraph 2115, Revised
Statutes of 1913, the relevant part of which reads
as follows:

25 Ariz.—22

"In all elections for directors or managers of any corporation, each shareholder shall have the right to cast as many votes in the aggregate as he should be entitled to vote under its charter, multiplied by the number of directors or managers to be elected at such election; each shareholder may cast the whole number of votes, either in person or by proxy, for one candidate, or distribute such votes among two or more of such candidates, and such directors or managers shall not be elected otherwise."

It is plain that these sections of the articles of incorporation prescribing the qualifications of voters are in conflict with this statute, but it did not become a part of the Code until 1912, nearly ten years after defendant corporation was organized, and at the time of incorporation .there was no provision dealing with the rights of shareholders to vote; hence it was proper for the articles to prescribe such regulations, and when so prescribed they became binding upon all concerned. *Commonwealth* v. *Detwiller*, 131 Pa. 614, 7 L. R. A. 357, 360, 18 Atl. 990, 992; *Mack* v. *De Bardeleben Coal & Iron Co.*, 90 Ala. 396, 9 L. R. A. 650, 8 South. 150; *State* v. *Swanger*, 190 Mo. 561, 4 Ann. Cas. 563, 2 L. R. A. (N. S.) 121, 89 S. W. 872; *Bartlett* v. *Fourton*, 115 La. 26, 38 South. 882. In Fletcher on Corporations, volume 3, paragraph 1658, this language appears:

"Where the charter or general law expressly declares who shall be entitled to vote and how they shall be entitled to vote, or imposes other restrictions, its provisions are controlling. The charter or general law may exclude nonresident stockholders, or other corporations, or may restrict the right to vote to persons who are registered as stockholders on the books of the corporation, or to members over a certain age, or fix the right to vote as between trustees and cestuis que trust, limit the number of votes to be cast by any one stockholder."

In *State* v. *Swanger, supra,* this language is used:

" 'There is no rule of public policy which forbids a corporation and its stockholders from making any contract they please in regard to restrictions on the voting power.' 2 Cook on Corporations, 5th ed., § 622–b; Clark and Marshall on Private Corporations, p. 1320.''

The regulations of the charter of defendant corporation were specially agreed to by the shareholders when they signed the stock subscription agreements or became the successors in interest of those who had, and according to Fletcher on Corporations, volume 3, paragraph 1660, the ''stockholders and the corporation may by contract impose restrictions on the voting power which do not violate any statutory or constitutional provisions.''

But if there had been no such agreement, acquiescence by appellant for a period of twenty years with full knowledge of the situation would amount to a ratification of these provisions.

By the original articles the association was authorized to construct power houses and transmission lines, and to create, transmit and use power for the accomplishment of its objects and purposes; but there is no provision granting it specific authority to produce hydroelectric power for sale, hence it is contended that the association is entirely without such power. An amendment purporting to confer it, however, was approved by the shareholders of defendant corporation on July 8, 1913; but it is claimed that such action was void and the amendment of no effect, because it was not adopted in accordance with the statute providing that amendments to articles of incorporation shall be by the affirmative vote of the person or persons holding a majority of its issued and outstanding shares of stock.

To operate the irrigation system, power was necessary, and plants for generating it in connection there-

with were constructed; but inasmuch as it was evident that it could be produced in large quantities at a reasonable cost as a mere incident to the operation of the irrigation works, and that any surplus could be sold at an advantage the United States government at a cost of approximately four and one-half million dollars (of which the defendant's shareholders paid approximately $450,000 by levying an assessment of $2.40 on each acre of land under the project), built hydroelectric power plants and transmission lines capable of producing and transmitting more than was needed to operate the irrigation system, and entered into contracts with various persons for supplying it to them, and when the association took over the operation and maintenance of the project it also agreed to perform the government's covenants under these contracts. It has since renewed some of these and entered into new ones with other parties, though it has been realized for some time since that power can be produced incidentally to the operation of the project only during the irrigating season because the water flowing from the reservoir at other seasons of the year is insufficient and cannot be increased for the sole purpose of producing power, and to render possible the continuous use of the stored water for this purpose, and at the same time not interfere with its primary purpose of irrigating the lands, the board of governors of defendant corporation has proposed, and its council and shareholders approved, Mormon Flat development No. 1, by which said corporation, in addition to the installation of new gates at the Roosevelt dam and the remodeling of existing power plants, intends to construct a dam across Salt River about twenty-seven miles below Roosevelt to catch again the waters which may be released from the Roosevelt reservoir to generate power during the seasons

of the year they are not needed for irrigation, and hold or regulate them until discharged for this purpose. This will not lessen the quantity of water nor prevent its application to the lands when needed, but is merely an incidental use of it and results in the production of what is really a by-product. Such a course of action is permissible because every corporation has certain incidental powers and the tendency of the modern decisions is to extend them for beneficial purposes. 2 Fletcher on Corporations, § 794, p. 1769, also § 803, p. 1779; 3 Thompson on Corporations, par. 2117; *People* v. *Kirk*, 65 Misc. Rep. 657, 122 N. Y. Supp. 604; *Jacksonville etc. Ry. Co.* v. *Hooper*, 160 U. S. 514, 40 L. Ed. 515, 16 Sup. Ct. Rep. 379 (see, also, Rose's U. S. Notes). And there can be no question but that the power plants and transmission lines have thus far been very helpful to the association and its stockholders, and will continue to be, because the annual receipts from the sale of power amount approximately to $3 per acre, which equals the annual construction charges to be paid the government, and this renders unnecessary the levying of an annual assessment for any purpose other than operation and maintenance which is $3 per acre. The construction of Mormon Flat development No. 1 will not only preserve this investment, but render it of greater value, since it will enable the association to produce and supply power regularly and without interruption and dispose of it to better advantage.

But if there existed under the original articles any doubt of the defendant's right to produce power for sale, it was removed by the amendment of July 8, 1913, specially permitting it, though it is contended that this amendment is void because it was not adopted in accordance with paragraph 770, Revised Statutes of 1901, or paragraph 2102, Revised Statutes of 1913, in that it did not receive the affirmative vote

of either a majority of the stockholders or the persons holding a majority of the outstanding shares of stock; but, as we view it, this was not required under the former, which was in existence when the defendant corporation was organized and reads as follows:

"770. (Sec. 10) The capital stock of any corporation organized hereunder may be increased or decreased and the articles may be amended in any of the particulars mentioned in section 6 of this title by the affirmative vote of a majority of the stockholders. Such amendment shall be signed and acknowledged by the president and attested by the secretary of the corporation, and no such amendment shall be valid unless recorded and published as the original articles are required to be."

The particulars mentioned in section 6 of the same title are these:

"1. The name of the corporators, the name of the corporation, and its principal place of transacting business.

"2. The general nature of the business proposed to be transacted."

Only certain, specific amendments were required to be made in accordance with these provisions, and among these there is not one of the kind under consideration. To confer specific power to do a thing which could be done theretofore only incidentally is a matter of agreement between the shareholders and may be accomplished in the manner the articles provide, as happened in this case. If the articles contained provisions regarding amendments or anything else contrary to the statute, they must, of course, give way to that extent; but in respect to those matters to which the statute does not apply the articles of incorporation govern. 1 Machen on Corporations, § 120, p. 111; *Nelson* v. *Keith-O'Brien Co.*, 32 Utah, 396, 91 Pac. 30; *Salt Lake Automobile Co.* v. *Keith-*

*O'Brien Co.,* 45 Utah, 218, 143 Pac. 1015, 1017; *Baldwin* v. *Miller & Lux,* 152 Cal. 454, 92 Pac. 1030, 1034; 14 Corpus Juris, 189. The general nature of the business to be transacted by the defendant corporation was in no way changed by the amendment permitting it to produce and sell hydroelectric power, since this did no more than convert an incidental power into a specific one. 2 Cook on Corporations, § 499, p. 1310.

It is again urged that the judgment is erroneous for the reason that at the time the bonds were authorized appellee was indebted in excess of the statutory limit of two-thirds of its capital stock, and that House Bill No. 1 (Laws 1923, c. 4), enacted by the sixth legislature of this state after the bonds were voted, providing that certain indebtedness should not be considered a part of that so limited, is void in so far as it purports to be retroactive. By its articles of incorporation appellee's authorized capital stock was fixed at $3,750,000, divided into 250,000 shares of the par value of $15 each, and its indebtedness limited to two-thirds of this amount, or $2,500,000; but by the agreement of September 8, 1917, under which the operation of the irrigation system was taken over by appellee, it assumed and agreed to pay an indebtedness to the United States of over $10,000,000, of which amount something over $9,000,000 is still due. This represents the construction cost of the irrigation system, including the power plants and transmission lines, for the payment of which the stockholders of appellee had already obligated their lands.

On the question of the limitation of corporate indebtedness, Arizona's statute is very similar to Iowa's, and it is held in that state that an indebtedness incurred in violation of these provisions is voidable merely, and therefore enforceable against the

corporation or those holding under it, and that no one except the state can question it. *Sioux City Terminal Railroad & Warehouse Co.* v. *Trust Co. of North America,* 173 U. S. 99, 43 L. Ed. 628, 19 Sup. Ct. Rep. 341 (see, also, Rose's U. S. Notes); *Garrett* v. *Burlington Plow Co.,* 70 Iowa, 697, 59 Am. Rep. 461, 29 N. W. 395. In the latter case it is said:

"We do not understand counsel for defendants to claim that a debt of a corporation beyond the prescribed limits of its indebtedness is invalid, and, if held by a director of the corporation, cannot be enforced for that reason alone. It may be that a director would be answerable to stockholders or others for negligence or mismanagement of the affairs of a corporation whereby debts were contracted in excess of the limitation prescribed in the articles of incorporation; but it cannot be claimed that such a debt, for a consideration received by the corporation, cannot be enforced against it."

The issue of bonds was voted January 4, 1923, and the amendment to the articles of incorporation authorizing an indebtedness of two-thirds of its capital stock, exclusive of the amount due the United States government and assumed by the association, was adopted at the same time by a vote of approximately 14 to 1. House Bill No. 1, which contains the following provision regarding limitation upon corporate indebtedness, was approved February 13, 1923:

"Provided, that indebtedness heretofore or hereafter authorized by not less than three-fourths of the votes cast in accordance with the provisions of the articles of incorporation and by-laws at any regular or special meeting or election of the stockholders of any corporation and approved by the Corporation Commission of the State of Arizona, shall not be subject to the limitations herein prescribed, and shall not be considered a part of the indebtedness so limited."

If the indebtedness in question had been actually incurred prior to the enactment of this provision, it would have been validated thereby, because this act of the legislature operates as a waiver by the state of its right to object, since it is curative in character in so far as it applies to an indebtedness theretofore authorized though general in its terms, for we understand the general rule to be that—

"Retrospective statutes curing defects in acts done, or authorizing or confirming the exercise of powers, are valid where the Legislature originally had authority to confer the powers or authorize the acts. A statute in the form of a curative act is void, however, where it attempts to impair vested rights, or to validate or confirm what the legislature could not originally have authorized." 12 C. J. 1091.

Undoubtedly the legislature had the power to pass the act originally, for the amount of indebtedness a corporation may incur is a matter entirely within legislative control, and there is no suggestion even that its passage or operation will impair any vested right. Hence, if the action of the stockholders of appellee corporation authorizing the issuance of bonds in an amount greater than two-thirds of its capital stock were questionable at the time, it was no longer so after the passage of House Bill No. 1.

The contention that this act is invalid because it was passed as an emergency measure, when no emergency in fact existed or was stated in the act itself, is untenable. The constitutional provision regarding emergency legislation is found in section 3, part 1, article 4, of the state Constitution, and reads as follows:

"The second of these reserved powers is the referendum. Under this power the Legislature, or five per centum of the qualified electors, may order the submission to the people at the polls of any measure, or item, section, or part of any measure, enacted by the

Legislature, except laws immediately necessary for the preservation of the public peace, health, or safety, or for the support and maintenance of the departments of the state government and state institutions; but to allow opportunity for referendum petitions, no act passed by the legislature shall be operative for ninety days after the close of the session of the Legislature enacting such measure, except such as require earlier operation to preserve the public peace, health, or safety, or to provide appropriations for the support and maintenance of the departments of state and of state institutions; provided, that no such emergency measure shall be considered passed by the Legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative. . . . "

The emergency clause, which appears in House Bill No. 1 as a separate section, is in the following language:

"Sec. 3. Whereas, the provisions of this act are necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, and this act is hereby exempted from the operation of the referendum provisions of the state Constitution, and shall take effect and be in full force and effect from and after its passage and its approval by the Governor."

The Constitution vests legislative authority in a legislature, but reserves to the people the right to reject or approve any act or part of any act of that body. This reserved power, however, does not apply to acts requiring "earlier operation to preserve the public peace, health or safety," nor to those providing "appropriations for the support and maintenance of the departments of state and of state institutions." Enactments of this character may be made immediately effective and thus excepted from the referendum by the legislature's stating in a separate section of the act why it is necessary and declaring the exist-

ence of an emergency. In House Bill No. 1 the legislature declared an emergency and stated that the provisions of the act were necessary for the preservation of the public peace, health and safety, though it did not state any facts from which one not acquainted with the reasons prompting its action could judge whether the peace, health or safety of the public really required its early operation. But this is not, as we view it, indispensable to a valid enactment of emergency legislation, though it might be the better course to pursue, because the legislature itself is the judge of the existence of conditions requiring the immediate operation of an act. The reasons for this view are well stated in the following excerpt from *Oklahoma City* v. *Shields,* 22 Okl. 265, 100 Pac. 559:

"Most unquestionably, those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine whether a given law is necessary for the preservation of the public peace, health, and safety. It has always been the rule, and is now everywhere understood, that the judgment of the legislative and executive departments as to wisdom, expediency, or necessity of any given law is conclusive on the courts, and cannot be reviewed or called in question by them. . . . The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The Constitution does not confer it upon any tribunal. It must, therefore, necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the legislature alone must be the judge, and, when it decides the fact to exist, its action is final."

See, also, *Kadderly* v. *Portland,* 44 Or. 118, 74 Pac. 710, 75 Pac. 222; *Van Kleeck* v. *Ramer,* 62 Colo. 4, 156 Pac. 1108; *Dayland & Cattle Co.* v. *State,* 68 Tex.

526, 4 S. W. 865; *Hanson* v. *Hodges,* 109 Ark. 479, 160 S. W. 392.

In answering the suggestion that unless the court exercise the power to determine whether the public peace, health or safety require the immediate operation of a law, the people can be deprived of the right to refer it, if the legislature intentionally or through mistake declare an early operation of the law necessary when in fact it is not, the Supreme Court of Oregon, in *Kadderly* v. *Portland, supra,* speaking through Judge BEAN, said:

"But, it is argued, what remedy will the people have if the Legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated? The obvious answer is that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction. Nor should it be supposed that the Legislature will disregard its duty, or fail to observe the mandates of the Constitution. The courts have no more right to distrust the Legislature than it has to distrust the courts. The Constitution has wisely divided the government into three separate and distinct departments, and has provided that no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in the Constitution expressly provided. Const. Or., art. III, § 1. It is true that power of any kind may be abused when in unworthy hands. That, however, would not be a sufficient reason for one coordinate branch of the government to assign for attempting to limit the power and authority of another department. If either of the departments, in the exercise of the powers vested in it, should exercise them erroneously or wrongfully, the remedy is with the people, and must be found, as said Mr. Justice STRAHAN in *Biggs* v. *McBride* [*supra*], in the ballot-box."

It is contended further that this amendment, notwithstanding the curative effect of House Bill No. 1, is void because it did not receive the affirmative vote of the person or persons holding a majority of its issued and outstanding shares of stock as required by the statute. The vote was as follows: Yes, 98,168; No, 7,117—and under the articles of incorporation this constituted an adoption, though the affirmative vote was less than a majority of the issued and outstanding shares of stock, which was approximately 200,000. This doubtless resulted from the fact that corporations, guardians, trustees, persons under twenty-one years of age, executors and administrators are denied the privilege of voting. A majority of the issued and outstanding shares participated in the election, however, and the great weight of authority is to the effect that statutes of this kind should be construed as requiring a majority of those voting, and we think this rule especially applicable where the corporation involved is *quasi* public in character and has several thousand shareholders scattered throughout a territory of approximately 200,000 acres and must express themselves at an election held very much the same as one at which state and county officials are chosen. In California the statute required a resolution creating a corporate bonded indebtedness to be adopted "by the unanimous vote of its board of directors," and where a corporation had thirteen directors and only seven were at a meeting, all voting in favor of creating such an indebtedness, it was held by the Supreme Court of that state that the resolution was adopted "by the unanimous vote of the board," because those present and participating, being a majority, constituted the board. *Tidewater etc. Ry. Co.* v. *Jordan,* 163 Cal. 105, Ann. Cas. 1913E, 1293, 41 L. R. A. (N. S.) 130, 124 Pac. 216; *Walker* v. *Hopping* (Tex. Civ. App.),

226 S. W. 146; *Gumaer* v. *Cripple Creek etc. Co.,* 40
Colo. 1, 122 Am. St. Rep. 1024, 13 Ann. Cas. 781, 90
Pac. 81; *Coxon* v. *Inhabitants of Trenton,* 78 N. J. L.
26, 73 Atl. 253; *Foster* v. *Mullanphy Plan. Mill Co.,*
92 Mo. 79, 4 S. W. 260. In the last case the Missouri
Supreme Court in upholding the same provision used
this language:

"Treating on this subject, Chancellor KENT says:
'There is a distinction taken between a corporate act
to be done by a select and definite body, as by a
board of directors, and one to be performed by the
constituent members. In the latter case a majority
of those who appear may act; but in the former a
majority of the definite body must be present, and
then a majority of the quorum may decide.' "

Not only this amendment, but a number of others,
have been adopted by the shareholders of the associa-
tion since its organization in 1903, and the same
method has been followed in each instance. No one
of them has ever before been questioned, but they
have each been accepted and acted upon as valid and
legal by all concerned, and any effort by a stockholder,
or even the state, to question them at this time, comes
too late. *Kent* v. *Quicksilver Min. Co.,* 78 N. Y. 159.

It is contended that the judgment is erroneous
for the reason that the articles of incorporation do
not authorize the issuance of bonds. There is no
provision specifically conferring this authority but
the articles contemplate the incurrence of an indebted-
ness, for it is provided in section 7 thereof that an
indebtedness exceeding $100,000 (as amended) for
other than ordinary operation, maintenance, and re-
pair purposes, may not be incurred in any one year
unless two-thirds of the votes cast at an election
called for that purpose ratify it. But even though
the articles did not confer this authority, the power
to incur an indebtedness for corporate purposes would
exist as an implied one, for—

"The power to contract includes the power to borrow money for legitimate purposes; and the power to purchase includes power to borrow money to pay for the thing purchased. In fact, it may be laid down as a general rule that whenever the charter of a corporation gives it the power, expressly or impliedly, to purchase property or otherwise incur a debt, it has the implied power, in the absence of restrictions in its charter, to borrow money to pay for the property or to pay the debt." 2 Fletcher on Corporations, par. 939, p. 1891.

See, also, 3 Thompson on Corporations, § 2167, p. 87; 3 Cook on Corporations, § 760, p. 2562.

The power of a corporation to issue bonds for corporate indebtedness is likewise implied where there are no restrictions in its articles of incorporation or the statute. It is a necessary result or incident of the power to contract a debt. "There seems to be no reason," said Judge HOAR in *Commonwealth* v. *Smith*, 10 Allen (Mass.), 448, 87 Am. Dec. 672, "why a railroad corporation should not be considered as having power to make a bond for any purpose for which it may lawfully contract a debt, without any special authority to that effect, unless restrained by some restriction, express or implied, in its charter, or in some other legislative act." 3 Cook on Corporations, § 762, p. 2821; 3 Thompson on Corporations, § 2235, p. 148; 2 Fletcher on Corporations, § 971, p. 1926.

Appellant urges further that the assessments proposed to be levied to assure the payment of the principal and interest of these bonds, and the recording of the same in the office of the recorder of Maricopa county, Arizona, are void because the levies are made prior to the year in which the bonds or the interest thereon become due and payable, and under the articles these should be levied from year to year as the time for payment of interest and principal

arrives, the same as levies for the other expenses of the association are made. The levying of the assessments in this manner by the board of governors at the time the bonds are issued was expressly authorized by the shareholders at the election of January 4, 1923, and on April 4th thereafter the counsel of appellee association, in pursuance of this authority and of the power conferred upon it by section 2 of the amendment to the articles of August 21, 1917, reading: ''The counsel shall have power to make and enforce necessary by-laws for the making, levying and collecting and enforcement of assessments and charges for service,'' adopted a by-law making it the duty of the board of governors of appellee to levy and record the assessment. There is no violation of the articles in this contemplated action. The interest from the beginning and a certain proportion of the principal each year after fifteen years shall have elapsed will be paid annually, and there is no reason why one assessment for the full amount, specifying the proper annual payments, may not be made as directed by the shareholders.

The board of governors of the association propose and intend to issue a trust deed by which the assessments levied against the lands of the shareholders will be assigned to a trustee to secure the payment of the principal and interest of the bonds, and it is contended that this cannot be done because it was not authorized and approved by the shareholders at the election of January 4, 1923. Authority to issue the bonds and levy the assessments does not, it is urged, include authority to incumber by trust deed or mortgage. Under the articles of incorporation the shareholders are required to approve the indebtedness, but this does not extend to the arrangement of the details of the loan or security therefor; such matters being left to the discretion of the council

and board of governors. Hence the direction to issue the bonds and levy the assessments to assure their payment necessarily implies the direction to do what is required to accomplish this end, and if assigning the assessments to a trustee is one of these, the power to do it has been conferred as an incident to the power to incur the bonded indebtedness itself. In 3 Fletcher on Corporations, section 1266, page 2231, it is said:

"This power to mortgage property is implied in the absence of restrictions, and need not be expressly conferred, as has sometimes been contended. 'The power to mortgage, when not expressly given or denied, must be regarded as an incident to the power to acquire and hold real estate and make contracts.'

"The corporation may mortgage its property by giving an absolute conveyance or bill of sale as security, and may give security on its property in the form of a trust deed."

On this proposition the authorities, both text-writers and decisions, are agreed. 3 Thompson on Corporations, § 2167, p. 87; 14A C. J. 546, 658; *West & Co.* v. *Dyson,* 230 Pa. 619, 79 Atl. 782; *Copper Belle Mining Co.* v. *Costello,* 11 Ariz. 334, 95 Pac. 94.

An investigation of the entire record, which is voluminous, discloses no substantial error. It is our conclusion that the Salt River Valley Water Users' Association, in undertaking the improvement designated as Mormon Flat development No. 1 and issuing its bonds to finance the same, is acting within its powers, and that none of the errors based upon proceedings so far had to accomplish this is well founded.

The judgment of the lower court upholding these proceedings is therefore affirmed.

ROSS and LYMAN, JJ., concur.