[Civil No. 3142. Filed November 23, 1931.]

[4 Pac. (2d) 1000.]

JAMES E. WARNER, Plaintiff, R. L. LINTON, Intervener-Plaintiff, Appellants, v. SCOTT WHITE, Secretary of State of the State of Arizona, Defendant, WM. M. BRAWNER, Intervener, Appellees.

Mr. F. C. Struckmeyer, Mr. E. S. Clark, and Mr. Mark B. Thompson, for Appellant Linton.

Mr. K. Berry Peterson, Attorney General, for Appellee Scott White.

Mr. L. M. Laney, for Appellee Wm. M. Brawner.

Mr. W. L. Barnum, *Amicus Curiae.*

McALISTER, C. J.—In March of this year the legislature passed an act which is commonly referred to as Senate Bill No. 116 and is carried in the Session Laws of the tenth legislature as chapter 103. It contains fifty-eight sections, the first fourteen of which provide for a survey of all the property of the state for purposes of taxation and the remaining forty-four fix a method for the collection of delinquent taxes. As passed it did not state in a separate section or at all that it was necessary that it become immediately operative, so on May 28, 1931, there were offered to the Secretary of State, Scott White, for filing, petitions containing the names of nearly 10,000 qualified electors of the state ordering that the first fourteen sections of it be referred to the vote of the electors of the state for their rejection or approval at the next general election, and on June 11th thereafter petitions containing the names of 3,000 additional electors were offered, but notwithstanding only 5,000 names were required to invoke the referendum, the Secretary of State, acting upon the advice of the Attorney General that it was doubtful whether the measure was referable, declined to file the petitions until the courts should determine this question.

Thereupon James E. Warner, doing business as the Warner Delivery Service, procured an alternative writ of *mandamus* directing him to file the petitions or show cause why he had not done so and his response thereto was a demurrer and an answer, the ground of the former being that the petition of the plaintiff did not state facts sufficient to constitute a cause of action for the reason that the act—the first fourteen sections of chapter 103—constitutes a law "for the support and maintenance of the departments of the State Government and State Institutions" and is, therefore, expressly excepted from the referendum

by the provisions of subdivision 3, § 1, art. 4, of the state Constitution. The answer raised the same question. Before the demurrer was argued the court granted the motion of Wm. M. Brawner for leave to intervene and he, too, demurred to the petition and answered further. Both demurrers were urged and at the completion of the argument sustained. Judgment was thereupon entered in favor of the defendant and the intervener and in it the court permanently enjoined the Secretary of State from placing the measure on the ballot at the next regular election upon the sole ground, as we gather from the record, that it was not referable. Following this the plaintiff, James E. Warner, gave notice of appeal to this court from the judgment but a few days later withdrew it. Upon this action's being taken by him the application of R. L. Linton to intervene was granted and from then on all proceedings in the case have been in his name as plaintiff-intervener. He immediately gave a second notice of appeal and thereafter performed what other acts were necessary to have the case reviewed by this court.

The only error he assigns is that the court erred in holding that the first fourteen sections of Senate Bill No. 116 are not referable, hence the only question presented by the appeal is the correctness of this ruling.

It is plain from a reading of the act—and by this we mean the first fourteen sections of Senate Bill 116—that its passage was prompted by a legislative desire to provide for a full and complete survey of all the taxable property of the state, as a basis for a just and equitable system of taxation, to the end that the correct value of all taxable property in the state should be ascertained and placed on the tax rolls and the Corporation Commission furnished with the valuations of the holdings of public service and public

utilities corporations for rate-fixing purposes. To conduct the survey the act creates a special tax survey commission composed of three members to be appointed by the Governor and confers upon it authority to appoint, fix the compensation and prescribe the duties of such experts, engineers, fieldmen, accountants, office assistants, clerks, stenographers and such other employees as may be required, and empowers it to do the things that are necessary to make a full and complete survey of all the property in the state. In order that it might have the funds to enable it to perform these various acts the bill appropriates them in this language:

"Section 8. To carry out the purposes of this act the sum of $250,000 is hereby appropriated out of the general fund, $100,000 to be available when this act becomes effective; $100,000 on the first day of July, 1931, and $50,000 on the first day of July, 1932."

It might be well to state that the ninth legislature had enacted a law, chapter 46, Session Laws 1929, commonly referred to as House Bill 127, to accomplish the same purpose and that those charged with the duty of carrying out its provisions made an effort to do so for the 1930 tax rolls but due to a lack of both time and funds were unable to accomplish more than to survey a part of the taxable property of the state, and for this reason what they did was held invalid and set aside. *Oglesby* v. *Chandler*, 37 Ariz. 1, 288 Pac. 1034. Nothing further was attempted under that act, however, and the tenth legislature repealed it, but to bring about the result it was intended to accomplish enacted Senate Bill 116, which is quite similar in its provisions, though it sets up a somewhat different machinery, allows more time and appropriates $250,000, instead of $30,000 as did House Bill 127.

The defendant and the intervener contend, and the trial court held, that due to the fact that Senate Bill 116 carries this appropriation and that its ultimate purpose is to aid the taxing department of the state in bringing about state-wide equalization of tax valuations, it is a law for the support and maintenance of a department of the state government and, therefore, could not in any event be subject to the referendum, in view of the provisions of subdivision 3, § 1, art. 4 of the state Constitution. This being true, they urge, it became operative at the expiration of ninety days from the close of the tenth legislature.

The position, upon the other hand, of appellant, and W. L. Barnum in his brief *amicus curiae*, is that it is not a law for the support and maintenance of a department of the state government within the meaning of this provision of the Constitution, for the reason that the department the appropriation was made to support and maintain was created by the act itself and had no existence prior to that time. While they state their view to be that an act appropriating money for the support and maintenance of an established department of the state government or a state institution is subject to the referendum the same as any other act, unless it be excepted therefrom in the manner provided, they do not argue this question at length but rely mainly on the other proposition. These respective contentions render necessary an understanding of the provisions upon which they are based; hence, we copy the first, second, and third subdivisions of section 1, article 4 of the Constitution. They read as follows:

"Article IV.
"Legislative Department.
"1. Initiative and Referendum.
"Section 1. (1) The legislative authority of the State shall be vested in a Legislature, consisting of

a Senate and a House of Representatives, but the people reserve the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature.

"(2) The first of these reserved powers is the Initiative. Under this power ten per centum of the qualified electors shall have the right to propose any measure, and fifteen per centum shall have the right to propose any amendment to the Constitution.

"(3) The second of these reserved powers is the Referendum. Under this power the Legislature, or five per centum of the qualified electors, may order the submission to the people at the polls of any measure, . . . enacted by the Legislature, except laws immediately necessary for the preservation of the public peace, health, or safety, or for the support and maintenance of the departments of the State Government and State Institutions; but to allow opportunity for Referendum Petitions, no Act passed by the Legislature shall be operative for ninety days after the close of the session of the Legislature enacting such measure, except such as require earlier operation to preserve the public peace, health, or safety, or to provide appropriations for the support and maintenance of the Departments of State and of State institutions; Provided, that no such emergency measure shall be considered passed by the Legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each House of the Legislature, taken by roll call of ayes and nays, and also approved by the Governor; and should such measure be vetoed by the Governor, it shall not become a law unless it shall be approved by the votes of three-fourths of the members elected to each House of the Legislature, taken by roll call of ayes and nays."

A reading of these provisions discloses that in the very beginning of the article creating the legislative

department of the state government the framers of the Constitution specifically reserved to the people "for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature," and it will be observed that in laying down this general principle they made no exception whatever but used the broad, all-inclusive language, "*Any* Act, or item, section, or part of *any* Act, of the Legislature." But if the language used at the end of the first clause of the second sentence of subdivision 3, namely, "except laws . . . for the support and maintenance of the departments of the State Government and State Institutions," means, as appellees contend it does, that in no event is an act for the support and maintenance of a department of the state government referable, we have in the same section of the Constitution two conflicting provisions, one declaring in positive language that such laws are referable and the other in equally strong terms that they are not. A casual reading of subdivision 3, however, in connection with subdivision 1, shows conclusively, to our minds, that the distinguished men who sat in the Constitutional Convention, a majority of whom were there as a result of their stand on the initiative and referendum, were not so careless as this view would indicate in choosing language to place these principles in workable form in the fundamental law. It will be noticed that it repeats in the first clause of the second sentence the principle announced in subdivision 1 that *any* measure passed by the legislature may be referred except it be one of two classes of laws, namely, "laws . . . for the preservation of the public peace, health, or safety," or (laws) "for the support and maintenance of the departments of the State Government and State Institutions." But it should be kept in mind that the exception is not of all laws of these two

classes, but only of those whose immediate operation is necessary to take care of the situation that prompted their passage. Appellees admit that this is true of the first class, or safety measures, but deny its application to the second, or support measures. Their position is that the words, "immediately necessary," qualify the phrase, "for the public peace, health or safety," and have no connection at all with the succeeding phrase, "for the support and maintenance of the departments of the State Government and State Institutions." When, however, this clause is read in connection with subdivision 1 and the two succeeding clauses of subdivision 3, it appears plain that the intention of the framers of these provisions was to except from the referendum such laws and such only as were immediately necessary for either of these purposes. To hold otherwise would be equivalent to saying that support laws are under no circumstances subject to the referendum and this cannot be done except by ignoring the fundamental proposition announced in subdivision 1 that "the power to approve or reject at the polls *any* Act" is reserved to the people.

This view is confirmed by the next two clauses, the first of which provides that no act passed by the legislature shall become operative for ninety days after its close but excepts from the comprehensive term, "*no* act," the same two classes of measures the first clause excepts, to wit, those "to preserve the public peace, health, or safety" and those "to provide appropriations for the support and maintenance of the departments of state and of state institutions." And it should be kept in mind also that this clause does not, any more than the first one, except all the laws of these two classes but only those that require earlier operation than ninety days to meet the conditions that brought forth their passage. In other

words, the second clause permits the two classes of measures the first clause exempts from the referendum to become operative earlier than other laws, provided the preservation of the public peace, health or safety or the financial needs of the state's departments and institutions require it. The contention of intervener, however, is that the support laws mentioned in the first clause and those "to provide appropriations for the support and maintenance" referred to in the second are not the same, the claim being that the former may or may not make an appropriation, while the latter refers only to measures carrying "appropriations." It is the view of appellee, White, however, that the words, "for the support and maintenance," as used in the first clause have reference to financial aid and to sustain this he cites *State* v. *Clausen,* 85 Wash. 260, Ann. Cas. 1916B 810, 148 Pac. 28, and *State ex rel. Flanagan* v. *Taylor,* 43 S. D. 264, 178 N. W. 985. In the second of these two cases the court used this language:

"Support of the state government certainly implies and embraces all necessary provisions for salaries, compensation, and expenses of its officers and employees. The word 'support,' therefore, clearly includes financial support."

In *State ex rel. Brislawn* v. *Meath,* 84 Wash. 302, 147 Pac. 11, the court says that the word "support" in this connection means financial support of the government, "that is, appropriation bills."

This is in accord with our understanding of the meaning of the term as here used. No one has pointed out to us just what measures not carrying appropriations might be classed as laws for the support and maintenance of the departments of the state government or state institutions. It is perhaps true in a broad sense that all laws are in aid of the government in some of its various departments, but it is

difficult to think of a law enacted to support or maintain a department of the state government or a state institution that does not carry an appropriation.

The third clause of this subdivision which sets forth the condition under which emergency measures shall be considered passed by the legislature shows clearly that no act is withdrawn from the referendum *ipso facto* under the Constitution of this state. It reads: "Provided, that no such emergency measure shall be considered passed by the Legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each House of the Legislature." The term, "no such emergency measure," refers to such measures as under the first clause are "immediately necessary" or under the second "require earlier operation than ninety days" and this includes the safety and support measures of both clauses. While it is true these two classes of laws are excepted from the referendum, it will be observed that they are not given this status merely because of their nature or the need for their earlier operation than ninety days but because, these things being true, the legislature, which is the judge of the question whether they should become immediately operative (*Orme* v. *Salt River Valley Water Users' Assn.*, 25 Ariz. 324, 217 Pac. 935), recognizes this necessity, expresses it in a separate section of the act and follows this with approval by a two-thirds vote of each house; in other words, incorporates in the act the emergency clause. In no other way may a law enacted by the legislature of this state, regardless of its nature or the urgency for its early operation, be withdrawn from the referendum.

We have been cited to decisions under the Constitutions of Colorado, South Dakota and Washington

to support the view that laws ''for the support and maintenance of the departments of the State Government and State Institutions'' are excepted *ipso facto* from the referendum, but the provisions of these Constitutions, while somewhat similar to that of this state, are not sufficiently so to render them of any great value in construing this particular provision of our Constitution.

We are clearly of the view, therefore, that there is no such thing under the Constitution of this state as an act's being *ipso facto* withheld from or in no event subject to the referendum, but upon the other hand that it was the undoubted purpose of the framers of the Constitution to provide that every act passed by the legislature should be referable unless it be a safety or support measure requiring immediate, or earlier operation than ninety days, and in either of these instances only when the legislature states this necessity in a separate section and passes the measure by a two-thirds vote of each house. The Constitution has made no difference in measures carrying appropriations and others, except to empower the legislature to make them immediately operative when in the judgment of two-thirds of the members of each house it is necessary that this be done. The framers of the Constitution, in providing that all laws should be subject to the referendum, were actuated by the thought that no act of the legislature, and certainly not those as vital to the state as acts appropriating its funds, which might at times be extravagant and unnecessary, should be placed beyond the veto power of the people. The contention that it would be unwise and might lead to serious results to permit a small percentage of the electors to hold up appropriations for the various departments of the government is without force in view of the fact that any meritorious act of this character will

have no trouble in gaining the approval of two-thirds the membership of each house of the legislature. But if it should happen that an appropriation bill should be passed without the emergency clause and all or sections of it later referred, and the state or some of its departments as a result should face the danger of not being able to function, the power to call the legislature into extraordinary session to avert such a calamity would be in the hands of the state's chief executive, and that body's right to deal with the matter would in no way be abridged by the fact that it had been referred to the electors for approval or rejection. It is not until a matter referred to them has been approved that the legislature's power to act thereon is in anywise affected. *McBride* v. *Kerby,* 32 Ariz. 515, 260 Pac. 435.

But if it were true that the Constitution excepted from the operation of the referendum *ipso facto* "laws . . . for the support and maintenance of the departments of the State Government and State Institutions," it is plain that Senate Bill 116 is not a law within the meaning of this language. Reference is here had to the departments of the state government in existence when the appropriation is made, for in the very nature of things the people could not be deprived of their right to approve or reject a law creating a department of the state government and prescribing its functions merely because it provides in addition the funds for the purpose of carrying out its terms in case it should finally come into being. The act was not passed for the purpose of appropriating money but to bring about a survey of the taxable property of the state, something that could not be accomplished without funds to defray the expenses of it, and the right of the people to say whether they think such legislation is wise or unwise, desirable or undesirable, is beyond question. To hold that an act may

not be referred because incidentally it provides the funds to accomplish the end it seeks would have the effect of practically nullifying the referendum provision of the Constitution, because many of the measures passed carry appropriations of this character, and it would be an easy matter to include such a provision in others and bring about the same result.

Some days after the appeal had been filed in this court appellee, intervener Brawner, moved to dismiss it upon the ground that this court had no jurisdiction to entertain it. The motion was not taken up then but continued for consideration in connection with the merits of the appeal. The record discloses that judgment in favor of the defendant, White, and the intervener, Brawner, was entered June 30, 1931, and that the following day the plaintiff, James E. Warner, gave notice of appeal but withdrew it on July 10th thereafter and declined to prosecute the appeal further, whereupon the petition of R. L. Linton to intervene as party-plaintiff was granted by the court, Honorable M. T. PHELPS presiding. The basis of the contention that this court is without jurisdiction is that the application to intervene was made after judgment by one not the successor in interest of a party thereto and, therefore, came too late to give the superior court jurisdiction to hear the matter.

We are of the view, however, that the trial court did act within its powers in making the order, for the reason that in securing the writ of *mandamus,* prosecuting the case at the trial and taking steps to appeal from the judgment against him, Warner was not acting for himself alone but as well for the people of the state, especially the nearly 13,000 electors who had signed the petitions and were presumably wanting the question, whether Senate Bill 116 was referable, passed upon by the court of last resort. That

he intended to and was acting in a representative capacity as well as for himself appears from his petition for the writ, for he states therein that by the refusal of the Secretary of State to file the petitions he and "other citizens similarly situated will suffer damage" and that the "people of Arizona will be denied their constitutional right and privilege of voting for the approval or rejection of said measure." But even if this language did not appear in the petition it is perfectly plain from the nature of the proceeding that he had no interest in the case different from that of the "other citizens similarly situated," and to say that the law would not permit one of these citizens to take up the burden where he threw it down and carry it to a conclusion would be a sad comment on the judicial system of this state. If the proceeding, that is, the petition for permission to intervene and the order allowing it could be, as its name suggests, regarded as one in intervention, there might be some basis for the intervener's contention, but it is plain that it was in effect merely one for a substitution of a party-plaintiff and cannot be treated as anything else. Hence, the trial court was not only justified but in a position to enter no order other than one permitting the substitution of Linton for Warner as plaintiff in order that the thousands of electors "similarly situated" to the latter might not be denied the right to have the judgment in which they were equally interested with him reviewed by the appellate court. Their right to substitute for a plaintiff who declined to prosecute such an action further, since his refusal to proceed with the case meant the loss of an opportunity to have it reviewed, was just as clear and undoubted as would have been their right to substitute for a plaintiff who had died at that stage of the action. His connection with the case would be just as completely severed in the one

instance as in the other and the fact that it was voluntary in the one, while involuntary in the other, would not render his action less serious in its consequences to those equally interested with him.

The judgment is reversed and the case remanded, with instruction to the lower court to direct by proper order the Secretary of State to file the petitions asking that Senate Bill 116 be referred.

ROSS and LOCKWOOD, JJ., concur.