IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**ARIZONA FREE ENTERPRISE CLUB, ET AL.,**
*Plaintiffs/Appellants,*

*v.*

**KATIE HOBBS, IN HER CAPACITY AS THE
SECRETARY OF STATE OF ARIZONA, ET AL.**
*Defendant/Appellee,*

*and*

**INVEST IN ARIZONA (SPONSORED BY AEA AND STAND FOR CHILDREN),
A POLITICAL COMMITTEE,**
*Real Party in Interest/Appellee.*

---

No. CV-21-0304-AP/EL
Filed August 19, 2022

---

Appeal from the Superior Court in Maricopa County
The Honorable Katherine M. Cooper, Judge
No. CV2021-011491
CV2021-016143
(Consolidated)
**REVERSED AND REMANDED**

---

COUNSEL:

Kory Langhofer (argued), Thomas Basile, Statecraft PLLC, Phoenix, Attorneys for Arizona Free Enterprise Club, Scot Mussi, and Diane Schafer

Spencer Scharff, Scharff PLC, Phoenix, Attorney for Katie Hobbs

Roopali H. Desai, D. Andrew Gaona (argued), Kristen Yost, Coppersmith Brockelman PLC, Phoenix, Attorneys for Invest in Arizona (Sponsored by AEA and Stand for Children)

Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix, Attorneys for Amicus Curiae Goldwater Institute

Daniel J. Adelman, Samuel Schnarch, Arizona Center for Law in the Public Interest, Phoenix; and Erin Adele Scharff, Phoenix, Attorneys for Amicus Curiae Arizona Center for Law in the Public Interest

Mark Brnovich, Arizona Attorney General, Joseph A. Kanefield, Chief Deputy and Chief of Staff, Brunn (Beau) Roysden, III, Solicitor General, Michael Catlett, Deputy Solicitor General, Jillian Francis, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General Mark Brnovich

JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK and KING joined. JUSTICE MONTGOMERY, joined by JUSTICE BEENE, concurred in part and dissented in part.

JUSTICE LOPEZ, Opinion of the Court:

¶1 We explain today the reasons for our prior decision order disqualifying Real Party in Interest Invest in Arizona's ("IIA") referendum petition seeking to refer Senate Bill 1828—sections 13 and 15—("SB 1828") to the ballot in the November 8, 2022 General Election. We conclude the exemption from the referendum power for laws "for the support and maintenance of the departments of the state government and state institutions," Ariz. Const. art. 4, pt. 1, § 1(3), applies to tax revenue measures. A revenue measure is exempt from referendum, regardless of the increase or decrease in revenue, provided it is for the support and maintenance of *existing* departments of the state government and state institutions.

## BACKGROUND

¶2 SB 1828 was passed during the First Regular Session of the Fifty-Fifth Arizona Legislature and signed by the Governor as a tax bill for the 2022 fiscal year. SB 1828 imposes a "flat" tax of 2.5% on taxable income but becomes effective only if the state General Fund revenues reach specified targets. SB 1828 was enacted in response to the Invest in

Education Act ("Prop 208"), which would have imposed an income tax surcharge of 3.5% on taxable income over $250,000 for single filers or filers who are married but filing separately, and $500,000 for married and head of household filers.[1] The parties agree that SB 1828's immediate effect likely would be to reduce the state's income tax revenue by reducing income tax liability to households subject to Prop 208.

¶3 IIA sought to prevent implementation of the flat tax by referring SB 1828 to the ballot in the November 8, 2022 General Election. On July 21, 2021, Appellants Arizona Free Enterprise Club, et al. ("Free Enterprise") filed a motion for preliminary injunction in Maricopa County Superior Court seeking to enjoin the Secretary of State from accepting or certifying any petition filed in support of a referendum of SB 1828, including IIA's petition. Free Enterprise challenged the referendum on two grounds: the Arizona Constitution exempts SB 1828 from referendum, and the petition sheets and signatures are statutorily deficient. IIA moved to dismiss Free Enterprise's challenge.

¶4 On December 20, 2021, the trial court ruled that SB 1828 is referable and, thus, may be submitted to the voters in the November 8, 2022 General Election. The court reasoned that it did not qualify as a "support and maintenance" measure under the Arizona Constitution because it did not appropriate state funds or generate necessary revenue. *See* Ariz. Const. art. 4, pt. 1, § 1(3). The court denied Free Enterprise's preliminary injunction request and granted IIA's motion to dismiss in part, leaving the challenge based on petition deficiencies in place.

¶5 Free Enterprise directly appealed the trial court's ruling to this Court pursuant to Arizona Rules of Civil Appellate Procedure 10(d)(1). Under Rule 10, a party may take a direct appeal "if the judgment involves a statewide initiative or referendum, the issue on appeal is of substantial statewide importance, and the issue otherwise would become moot before Supreme Court review." This case requires us to interpret article 4, part 1, section 1(3) of the Arizona Constitution ("section 1(3)") and the referendum power, both issues of statewide importance that would become moot if this Court's review were delayed until after the November 8, 2022 General

---

[1] The Maricopa County Superior Court invalidated Prop 208 in March 2022, following remand from this Court in *Fann v. State*, 251 Ariz. 425, 443 ¶ 65 (2021).

Election.  On April 21, 2022, following oral argument, we issued a decision order reversing the trial court's order with a more detailed opinion to follow.  This is that opinion.  We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶6          The three branches of government in Arizona share an equal duty in applying and upholding our state constitution, but "our courts bear ultimate responsibility for interpreting its provisions."  *Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 8 (2006); *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000) ("The ultimate interpretation and determination of the [Constitution's] substantive meaning remains the province of the Judicial Branch.").  The task before us is to interpret the text of section 1(3) to determine its meaning and the scope of the exemption of laws from the referendum power.  *See Ariz. Sch. Bds. Ass'n v. State*, 252 Ariz. 219, 229 ¶ 45 (2022) (noting that this Court's constitutional duty is to interpret and apply the constitution).

## I.

## A.

¶7          The Arizona Constitution reserves the powers of initiative and referendum to the people.  Ariz. Const. art 4, pt. 1, § 1(1).  The initiative power allows qualified electors to propose legislation.  *Id.* § 1(2).  The referendum power has two forms—the first permits the legislature to refer a legislative enactment to a popular vote, and the second permits qualified electors to circulate petitions, and refer to a popular vote, legislation that has been enacted by the elected representatives.  *Id.* § 1(3).  Arizona's public policy strongly favors the initiative and referendum processes, *W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 428 (1991), which compels broad construction of the constitutional right to referendum.  This public policy, however, is tempered by the nature of the referendum power.  "Because the referendum is an 'extraordinary' power that permits a 'minority to hold up the effective date of legislation which may well represent the wishes of the majority,' we require referendum proponents to comply strictly with applicable constitutional and statutory provisions."  *Id.* at 429 (internal citation omitted) (first quoting *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5 (1972); and then quoting *Cottonwood Dev. v. Foothills Area Coal.*, 134 Ariz. 46,

49 (1982)); *see also* A.R.S. § 19-101.01 ("[T]he constitutional and statutory requirements for the referendum [must] be strictly construed . . . .").

**¶8**　　　Section 1(3), which establishes the referendum power, is a dense provision that has befuddled our courts since its inception. *See Clark v. Boyce*, 20 Ariz. 544, 546 (1919) (remarking that "we must admit that it has cost us no little trouble to arrive at a conclusion" concerning the interpretation of section 1(3)). Section 1(3) provides:

> The second of these reserved powers is the referendum. Under this power the legislature, or five per centum of the qualified electors, *may order the submission to the people* at the polls of any measure, or item, section, or part *of any measure, enacted by the legislature*, except laws immediately necessary for the preservation of the public peace, health, or safety, *or for the support and maintenance of the departments of the state government and state institutions*; but to allow opportunity for referendum petitions, no act passed by the legislature shall be operative for ninety days after the close of the session of the legislature enacting such measure, except such as require earlier operation to preserve the public peace, health, or safety, *or to provide appropriations for the support and maintenance of the departments of the state and of state institutions*; provided, that no such emergency measure shall be considered passed by the legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each house of the legislature, taken by roll call of ayes and nays, and also approved by the governor; and should such measure be vetoed by the governor, it shall not become a law unless it shall be approved by the votes of three-fourths of the members elected to each house of the legislature, taken by roll call of ayes and nays.

(Emphasis added.)

**B.**

¶9        We first consider whether revenue laws "for the support and maintenance of the departments of the state government and state institutions" are exempt from referendum under section 1(3).  The trial court, citing *Garvey v. Trew*, 64 Ariz. 342, 353 (1946), ruled that SB 1828 did not qualify for exemption as an appropriation measure.  In other words, the court reasoned, and IIA contends, that only appropriation measures, rather than support and maintenance revenue provisions, are exempt from the referendum process.  We disagree.

¶10        "When interpreting a constitutional provision, 'we begin with the text,' because it is 'the best and most reliable index of a [provision's] meaning.'"  *Fann v. State*, 251 Ariz. 425, 441 ¶ 59 (2021) (alteration in original) (quoting *State v. Christian*, 205 Ariz. 64, 66 ¶ 6 (2003)).  In discerning the text's meaning, the most objective criterion available is the accepted meaning of the words, in context, when the provision was adopted.  *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 16, 78 (2012).  If the text is unambiguous, we apply its express terms without applying secondary methods of construction.  *Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 249 Ariz. 396, 406 ¶ 28 (2020).  We also afford meaning to "each word, phrase, and sentence . . . so that no part will be void, inert, redundant, or trivial."  *Id.* (alteration in original) (quoting *City of Phoenix v. Yates*, 69 Ariz. 68, 72 (1949)).  "An absurd construction of a constitutional provision should be avoided."  *Ruth v. Indus. Comm'n*, 107 Ariz. 572, 576 (1971).  We may examine our constitution's history to determine the framers' intent.  *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 12 (1986).

¶11        In determining whether support and maintenance laws are exempt under the Arizona Constitution, it is beneficial to analyze section 1(3) as containing two separate clauses.  The first clause provides:

> Under this power the legislature, or five per centum of the qualified electors, *may order the submission to the people* at the polls of any measure, or item, section, or part *of any measure, enacted by the legislature, except laws* immediately necessary for the preservation of the public peace, health, or safety, or *for the support and maintenance of the departments of the state government and state institutions.*

Ariz. Const. art. 4, pt. 1, § 1(3) (emphasis added).  Thus, under the first clause, laws "immediately necessary for the preservation of the public peace, health, or safety, or *for the support and maintenance of* the departments of the state government and state institutions" are exempt from referendum.  *Id.* (emphasis added).

**¶12**        The second clause provides that:

> to allow opportunity for referendum petitions, *no act passed by the legislature shall be operative for ninety days* after the close of the session of the legislature enacting such measure, *except* such as require earlier operation to preserve the public peace, health, or safety, or *to provide appropriations for the support and maintenance of the departments of the state and of state institutions*.

*Id.* (emphasis added).  Thus, under the second clause, laws exempt from the ninety-day operative delay are confined to those necessary "to preserve the public peace, health, or safety, or *to provide appropriations for* the support and maintenance of the departments of the state and state institutions."  *Id.* (emphasis added).

**¶13**        The original draft of section 1(3)'s first clause permitted exercise of the referendum power "except as to the laws necessary for the immediate preservation of the public peace, health, or safety, and *appropriations* for the support and maintenance of the Departments of State and State institutions."  *The Records of the Arizona Constitutional Convention of 1910*, at 1020–21 (John S. Goff ed., 1991) (emphasis added).  In other words, the original language in the first clause mirrored that of the second clause in that it limited the class of exempt support and maintenance laws to "appropriations."  The version of section 1(3) that was ratified in 1912, however, omitted reference to "appropriations" in the first clause and, instead, exempted from referendum "laws . . . *for the support and maintenance of* the departments of the State Government and State institutions."  Ariz. Const. art. 4, pt. 1, § 1(3) (emphasis added).  The constitutional convention records do not definitively elucidate the founders' reasoning in modifying this language in section 1(3).  We are loath, however, to discount the founders' decision to excise "appropriations" from the first clause of section 1(3) in favor of the ratified

iteration as a drafter's error or other inadvertence. We must give section 1(3)'s text meaning as ratified. *See Arizonans for Second Chances, Rehab., & Pub. Safety*, 249 Ariz. at 406 ¶ 28; *see also Brousseau v. Fitzgerald*, 138 Ariz. 453, 455 (1984) (noting that when the legislature changes the language of a statute, the presumption is an intent to make a change in the law).

¶14 Section 1(3)'s first clause enumerates the types of measures exempt from the referendum power: (1) "laws immediately necessary for the preservation of the public peace, health, or safety"; and (2) laws for the support and maintenance of state departments and state institutions. The first clause's reference to laws "for the support and maintenance," in context, necessarily entails a broader meaning than the second clause's use of "appropriations." An appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." *League of Ariz. Cities & Towns v. Martin*, 219 Ariz. 556, 560 ¶ 15 (2009) (quoting *Hunt v. Callaghan*, 32 Ariz. 235, 239 (1927)). Support is defined as "a broader term embracing both the acquisition and allocation of funds." *Wade v. Greenlee County*, 173 Ariz. 462, 463 (App. 1992). These definitions align with the common meaning of these familiar terms.

¶15 We reject the notion that section 1(3)'s reference to "support and maintenance" is synonymous with "appropriations." Measures that provide "support and maintenance" include laws that raise or disburse revenue, while "appropriations" merely disburse revenue generated through laws for support and maintenance. *See Wade*, 173 Ariz. at 463 ("Appropriations . . . are only part of support, the act of allocating independent of how the money was acquired."). Thus, an appropriation is a subset of measures that provide support and maintenance for state government. This broader interpretation of section 1(3) harmonizes its two clauses, which involve different types of inherently related laws: the first clause exempts laws that raise or disburse revenue for the support and maintenance of identified state governmental entities and the second clause solely concerns appropriations that disburse funds from already-generated revenue.

¶16 Our jurisprudence harmonizes with our interpretation of section 1(3). Contrary to the trial court's and IIA's claim, we have never expressly limited exempt measures under section 1(3) to appropriations. In

*Warner v. White*, 39 Ariz. 203, 214 (1931), we held that "it was the undoubted purpose of the framers of the Constitution to provide that every act passed by the Legislature should be referable unless it be a safety or support measure requiring immediate, or earlier operation than ninety days." Although *Warner* erroneously engrafted the first clause's "immediately necessary" requirement onto the support and maintenance provision, we did not expressly limit the referendum exemption to appropriations.

¶17 Fifteen years later, we disavowed *Warner* to the extent it read the words "immediately necessary" to apply to the "support and maintenance" referendum exemption. *Garvey*, 64 Ariz. at 352–53. It is debatable whether *Warner* or *Garvey* offers the best interpretation of section 1(3)'s "immediately necessary" requirement. But "[w]e are mindful of the importance of stare decisis," *Sell v. Gama*, 231 Ariz. 323, 329 ¶ 30 (2013), and "do not lightly overrule precedent and do so only for compelling reasons," *Lowing v. Allstate Ins.*, 176 Ariz. 101, 107 (1993) (quoting *Wiley v. Indus. Comm'n*, 174 Ariz. 94, 103 (1993)). *Garvey* has been the prevailing interpretation and application of "immediately necessary" for over seventy-five years, and it is not clearly erroneous. Thus, we find no compelling reason to overrule *Garvey* on this point and we adhere to its reasoning. *See id.* ("[T]he degree of adherence demanded by a prior judicial decision depends upon its merits, and it may be abandoned if the reasons for it have ceased to exist or if it was clearly erroneous or manifestly wrong.").

¶18 In *Garvey*, we considered whether a specific appropriation bill was exempt from a referendum challenge under section 1(3) and held that "the test of whether the appropriation is for the support and maintenance is not the earmarking for a specific pupose [sic], but rather [whether] the funds [are] appropriated for use in carrying out the objects and functions of the department." 64 Ariz. at 347. There, the subject bill directed $50,000 to the Arizona Corporation Commission to ascertain a fair market value of all property of public service corporations providing gas or electric utilities in order to create utility rates. *Id.* at 345. We concluded that the Secretary of State correctly refused to file the referendum petitions because the appropriation was for the support and maintenance of the existing functions of the Corporation Commission and thus exempt from referendum challenge under section 1(3). *Id.* at 346–47, 355.

**¶19**        Although *Garvey* established that the *specific* appropriation measure at issue was exempt from referendum, it did not limit the *type* of exempt measures to appropriations. *See id.* at 346–48. Rather, because the bill itself was an appropriation, we merely defined *that* bill as an exempt appropriation under section 1(3). *See id.* Thus, we did not cabin section 1(3)'s referendum exemption to appropriations and emergency measures for the preservation of the public peace, health, or safety.

**¶20**        Our holding that revenue laws "for the support and maintenance" of state departments and institutions are exempt from the referendum power under section 1(3) does not foreclose a challenge to every law that raises state revenue. A revenue law is exempt from referendum only if it supports *existing* state departments or state institutions. *See id.* at 348 ("Here the only effect or new features of the measure sought to be referred is the appropriation itself, the commission being already vested with the power and the duty to perform the acts mentioned in the law."). We announced this principle in *Warner*, affirmed it in *Garvey*, and reaffirm it now. *Id.* ("In the *Warner* case it was very properly held that the measure was not one for the support and maintenance of a state department, but for the creation of a new department, and, not being passed with the emergency, it was referable."). Thus, the people retain the right to challenge a law creating a new department of the state even if it also raises revenue to support the newly minted department. *Warner*, 39 Ariz. at 215 ("[T]he people could not be deprived of their right to approve or reject a law creating a department of the state government and prescribing its functions merely because it provides in addition the funds for the purpose of carrying out its terms in case it should finally come into being."). Additionally, unlike the Washington Constitution which exempts laws for the "support of the state government," Wash. Const. art. 2, § 1(b), Arizona's support and maintenance exemption is tethered to funding existing state *departments* and state *institutions*, Ariz. Const. art. 4, pt. 1, § 1(3). Consequently, a revenue measure in Arizona that merely supports state objectives, such as increasing unemployment benefits, would be subject to referendum. *See* Wash. Const. art 2, § 1(b) (providing that the referendum power does not apply to "such laws as may be necessary for the immediate preservation of the public peace, health or safety, *support of the state government and its existing public institutions*" (emphasis added)).

## C.

**¶21** We next address the differential treatment of "support and maintenance" measures and appropriations under section 1(3)'s second clause, which exempts certain laws from the ninety-day operative delay under its "earlier operation" provision.

**¶22** The second clause provides that laws "requir[ing] earlier operation to preserve the public peace, health, or safety" must go into effect immediately, given the urgency of protecting the public, *see* Ariz. Const. art. 4, pt. 1, § 1(3); *Garvey*, 64 Ariz. at 353–54, and that exempt appropriations, i.e., those that are intended to fund existing state government operations, are effective immediately, *Garvey*, 64 Ariz. at 354–55. Under our interpretation of section 1(3), which affords meaning to every word of the provision and implements what the text commands, exempt non-appropriation "support and maintenance" revenue measures, like SB 1828, are subject to the ninety-day referendum period before they become effective "to allow opportunity for referendum petitions." Ariz. Const. art. 4, pt. 1, § 1(3).

**¶23** The parties dispute whether a logical purpose exists for the founders to exempt "support and maintenance" revenue laws from the referendum process in the first clause but simultaneously exclude them from the "earlier operation" provision in the second clause. We may consider the text's purpose but only to decide which textually permissible meaning to adopt. *See* Scalia & Garner, *supra*, at 57 ("[E]xcept in the rare case of an obvious scrivener's error, purpose—even purpose as most narrowly defined—cannot be used to contradict text or to supplement it. Purpose sheds light only on deciding which of various *textually permissible meanings* should be adopted.").

**¶24** We conclude section 1(3)'s text yields a logical structure, and we consider its purpose only to ascertain which textually permissible interpretation to adopt. To that end, we note its first and second clauses relate to different types of exempt laws—one that generates revenue and appropriates funds for the support and maintenance of the state and another that disburses existing revenue without delay.

**¶25** We presume the disparate procedural treatment of these laws in the second clause serves a purpose consistent with its textual design for

11

several reasons. First, the first clause exempts revenue and appropriation laws from referendum to ensure that existing state departments and institutions continue to function without disruption in the new fiscal year. *See Wade*, 173 Ariz. at 464 ("The functioning of government can be as effectively damaged by the inability to acquire funds as by the inability to spend them."). Second, the exercise of police powers and appropriation of funds to operate the government entail an immediacy for implementation that distinguishes such measures from general revenue provisions. Third, although "appropriations" are readily identifiable and more often will qualify for exemption as in *Garvey*, whether revenue laws qualify as measures for "support and maintenance" of existing departments and institutions may present a more nuanced inquiry. The ninety-day period allows citizens an opportunity to evaluate and challenge whether the measure is truly for the "support and maintenance" of the existing state departments and state institutions, as some revenue measures may not fall into this category. *Supra* ¶ 20. *Wade* and this case illustrate that point. Finally, this period also gives the public time to learn of additional obligations of the new laws—here, assessing potential tax liability or relief from taxation. *See* John D. Leshy, *The Arizona State Constitution* 126 (2013).

¶26 These purposes are consistent with our textually permissible interpretation of section 1(3) and refute any notion that its text must trace to a drafter's error or that we have settled on an absurd construction. Indeed, a contrary reading that provides exemption from referral only for appropriation measures voids all independent meaning from the framers' deliberate decision to substantively vary the provisions of the two clauses.

**D.**

¶27 Our holding that revenue measures for the support and maintenance of existing state departments and institutions are exempt from the referendum process under section 1(3) is hardly a novel interpretation of our constitution. In *Wade*, the court of appeals considered a new one-half cent sales tax to fund existing county programs and affirmed the trial court's ruling that the measure was exempt from the referendum process. 173 Ariz. at 463. *Wade* established a persuasive analytical template for the referendum exception's arguable internal inconsistencies, noting that "[s]upport is a broader term embracing both the acquisition and allocation of funds. Support cannot occur without money. Appropriations, however, are only part of support, the act of allocating independent of how the money

was acquired." *Id.* Adopting "the broader interpretation of what is excluded from referendum," the court examined the records of the convention and concluded that the removal of "appropriations" in section 1(3)'s first clause suggested a purposeful effort to broaden the concept of "support" to cover more than simply appropriations. *Wade*, 173 Ariz. at 464. Through this lens, the court concluded the challenged sales tax qualified under the referendum exception as a support measure because the sales tax was used "as part of total revenues necessary to meet the annual county budget."[2] *Id.*

**¶28** We also note that the most recent Attorney General opinion interpreting section 1(3) accords with our holding.[3] *See* Op. Ariz. Att'y Gen. I97-007, 1997 WL 566650, at *2 & n.3 (1997) (concluding that neither tax nor appropriation measures are referable under the Arizona Constitution). There, the Attorney General analyzed section 1(3) as we do here: the constitution exempts from referendum laws immediately necessary to preserve peace, health, or safety; laws "for the support and maintenance"; *and* laws that "provide appropriations for the support and maintenance of the [d]epartments of the [s]tate and of [s]tate institutions." *Id.* at *2 (quoting Ariz. Const. art. 4, pt. 1, § 1(3)). Because the bill at issue was not a peace, health, or safety measure passed with an emergency clause or a tax measure, the bill was not excluded from referendum on those bases and could be exempt from referendum only if it was an appropriation that provided for the support and maintenance of departments of the state or state institutions. *Id.* Thus, the Attorney General recognized the textual difference between the clauses in section 1(3) and differentiated between measures that provide support and specific appropriation measures. In issuing the opinion, the Attorney General disavowed an earlier opinion

---

[2] We note *Wade*'s questionable application of section 1(3) to a *county* tax because this constitutional provision applies only to revenue measures that are "for the support and maintenance of the departments of the *state* government and *state* institutions." Ariz. Const. art. 4, pt. 1, § 1(3) (emphasis added). Although we do not decide the issue today, we clarify that our embrace of *Wade*'s interpretation of section 1(3) does not extend to its applicability to a county tax.

[3] We recognize that, although opinions of the Attorney General are advisory, "the reasoned opinion of a state attorney general should be accorded respectful consideration." *Ruiz v. Hull*, 191 Ariz. 441, 449 ¶ 28 (1998).

concluding that the public's right of referendum extended to non-appropriation tax measures.  *Id.* at \*2 n.3; *see* Op. Ariz. Att'y Gen. I90-068, 1990 WL 484076, at \*5 (1990).

### E.

**¶29**         We next consider whether a tax measure must increase revenue to qualify for exemption from the referendum process under section 1(3).  The trial court, citing *Wade*, ruled that even if the support and maintenance exemption applies to revenue measures, it is limited to laws that increase revenue.  Here, because the trial court concluded that SB 1828 would at least initially decrease tax revenue, it ruled, and IIA contends, that SB 1828 is subject to referendum.  We disagree.

**¶30**         The constitution provides that "laws . . . for the support and maintenance of the departments of the state government and state institutions" are exempt from referendum.  Ariz. Const. art. 4, pt. 1, § 1(3). The text is devoid of any reference to a requirement that "support and maintenance" measures increase revenue.  All measures that generate revenue, whether they increase or decrease revenue from one fiscal year to the next, provide support and maintenance.  *Wade* does not diverge from this logic.  There, the court of appeals defined the term "support" as "embracing both the acquisition and allocation of funds," which cannot occur without raising revenue. *Wade*, 173 Ariz. at 463.  The fact that the tax measure at issue in *Wade* increased revenue does not support the proposition that a revenue measure *must* do so to be exempt.  Therefore, even if the amount of "support" decreases from the prior fiscal year because of a revenue-*decreasing* measure, it will qualify for exemption under section 1(3) if it generates funds and they are appropriately allocated for the support and maintenance of existing state departments and institutions.

**¶31**         The absence of any textual support in the constitution for the proposition that only tax measures that immediately increase revenue are exempt from the referendum process perhaps reflects the founders' wisdom.  Conditioning the referendum exemption on the revenue effect of a support and maintenance measure is a fool's errand that raises myriad questions concerning the temporal scope of the inquiry and rests on the vagaries of economic projections.  *Cf. Armstrong v. United States*, 759 F.2d 1378, 1381 (9th Cir. 1985) (holding that, under the origination clause of the Constitution, "[t]he term 'Bills for raising Revenue' does not refer only to

14

laws *increasing* taxes, but instead refers in general to all laws *relating to* taxes"). The net revenue impact of a bill in the short term may invariably differ from its long-term effect. Thus, all revenue measures that support and maintain existing state departments and institutions, including those that decrease net revenue, are exempt from referendum.[4]

## II.

**¶32**        The dissent effectively contends that the majority interprets section 1(3) to provide "categorical exemptions from the referendum" and fails to "give operative effect to every provision within section 1(3) consistent with the framers' intent." *Infra* ¶ 60. We disagree. Our interpretation does not categorically exempt tax revenue measures, but rather limits the exemption to such measures for the support and maintenance of existing state government departments and institutions, *supra* ¶ 20, and gives meaning and purpose to every provision of section 1(3).

**¶33**        We embrace the dissent's recounting of the history of the referendum power, which is not in dispute. *Infra* ¶¶ 43–46. But the dissent's citations to the constitutional convention record fail to delineate the precise scope of section 1(3)'s referendum exemption. Instead, the dissent relies heavily on the First Legislature's treatment of section 1(3) in its passage of legislation. *Infra* ¶¶ 47–49. Although the examples may "give credence to an interpretation" of section 1(3) that every exemption requires an emergency measure, *infra* ¶ 49, conduct of a subsequent legislature does not fill the void in the constitutional convention record, and we are reluctant to rely on legislative understanding of a constitutional provision as a primary source of authority for our own interpretation, *cf. Napolitano*, 213 Ariz. at 485 ¶ 8 ("Although each branch of government must apply and uphold the constitution, our courts bear ultimate responsibility for interpreting its provisions."). Similarly, we acknowledge that our earlier cases interpreted section 1(3) differently, *infra* ¶ 50–54, but our holding today aligns with this Court's most recent consideration of the issue, *supra* ¶¶ 17–20. Because we conclude that *Garvey*'s reasoning is not clearly

---

4        We do not decide today whether a law that entirely eliminates an existing tax qualifies as a measure for the support and maintenance of the state departments and institutions.

erroneous, *supra* ¶ 17, we do not share the dissent's view that stare decisis principles warrant its reversal, *infra* ¶¶ 60–73.

**¶34** We next address the dissent's textual interpretation of section 1(3), which undergirds its assertion that our interpretation fails to "give operative effect to every provision within section 1(3) consistent with the framers' intent," *infra* ¶ 60, namely the section's "emergency measure" (which the dissent styles the "last clause"), *infra* ¶ 84–85. The dissent suggests that we fail to give the last clause its due because our interpretation does not recognize an emergency measure as a prerequisite for exemption of any law under section 1(3). We are unpersuaded.

**¶35** Section 1(3)'s last clause prescribes the procedural requirements for implementing "emergency measures" contemplated in the first and second clauses and reads, in part,

> provided, that no *such emergency measure* shall be considered passed by the legislature unless it shall state in a separate section why it is necessary that it shall become immediately operative, and shall be approved by the affirmative votes of two-thirds of the members elected to each house of the legislature.

Ariz. Const. art. 4, pt. 1, § 1(3) (emphasis added). To give the term "such" meaning, there must be a reference before this clause. The prior (and only) "emergency measure" referenced is one that "require[s] earlier operation to preserve the public peace, health, or safety" in the second clause. The last clause thus clarifies which laws "require" earlier operation—those passed by a two-thirds vote with an immediate effective date—and are thus non-referable because they are laws, as described in the first clause, "immediately necessary for the preservation of the public peace, health, or safety." *See Garvey*, 64 Ariz. at 354 (concluding that the emergency provision of section 1(3) "refers strictly to emergency measures, to-wit, those pertaining to public peace, health[,] or safety, and [does] not include appropriation measures").

**¶36** The dissent concludes that referendum exemptions are limited to "laws immediately necessary for the preservation of the public peace, health, or safety," and laws that "provide appropriations," *infra* ¶¶ 75, 79, and that an "emergency measure" is a prerequisite for

exemption of any law, including appropriations for the support and maintenance of state departments and institutions, *infra* ¶¶ 84–86. Aside from the fact that this interpretation disregards the framers' striking of "appropriation" in the first clause, *supra* ¶ 13, the dissent's premise is incongruous with its earlier conclusion that the first clause's "immediately necessary" and the second clause's "earlier operation" provisions do not apply to support and maintenance measures, *infra* ¶¶ 76, 79–80. If the "immediately necessary" and "earlier operation" qualifiers do not apply to support and maintenance measures in the first and second clauses, the last clause's reference to "such emergency measure[s]" most reasonably refers only to "public peace, health, or safety" laws and necessarily excludes support and maintenance measures. Our interpretation, as with *Garvey*'s, does not fail to give operative effect to the last clause; rather, consistent with section 1(3)'s text, our analysis limits the last clause's emergency measure requirement to laws to preserve the public peace, health, or safety. 64 Ariz. at 354. Thus, contrary to the dissent's claim, our interpretation merely implements section 1(3)'s exemption and does not infringe the referendum power under section 1(1). *Infra* ¶¶ 66–69.

### III.

¶37        IIA requests attorney fees and costs under the private attorney general doctrine and A.R.S. §§ 12-341 and -342. The private attorney general doctrine is an equitable rule that allows a court to award fees to "a party who has vindicated a right that (1) benefits a large number of people, (2) requires private enforcement, and (3) is of societal importance." *Ansley v. Banner Health Network*, 248 Ariz. 143, 153 ¶ 39 (2020). IIA has not vindicated any right and therefore is not entitled to fees. We also deny IIA's request for costs under §§ 12-341 and -342 because it is not the prevailing party.

### CONCLUSION

¶38        Our interpretation of section 1(3) implements the founders' original plain meaning, as expressed in the text, concerning the meaning and scope of the referendum power to challenge tax laws. We interpret constitutional and statutory provisions as they are written, and we are constrained from rewriting the law under the guise of interpreting it even if we divine a more desirable intended outcome than the text allows. *Cf. Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 566 ¶ 44 (2018) ("We decline

to recast the statute's meaning under the guise of interpreting it."). Thus, even Arizona's strong public policy favoring the constitutional right to referendum does not supplant our duty to interpret and apply the constitution as it is written. *Cf. Ariz. Sch. Bds. Ass'n*, 252 Ariz. at 229 ¶ 45 ("[Our] constitutional duty to interpret and apply the constitution requires us to invalidate a law if it infringes the constitution.").

**¶39**        Our holding that revenue laws like SB 1828 are exempt from the referendum process as measures for the support and maintenance of existing departments of the state government and state institutions does not deprive our citizens of constitutional recourse to change our tax laws. Our constitution affords myriad avenues to affect political and policy change, including on the subject of taxes. Citizens may change such laws indirectly through the ballot box by selecting their elected representatives to implement their policy preferences or directly through the initiative process. Ariz. Const. art. 4, pt. 1, § 1(2). This Court has no voice on the choices our citizens make on the wisdom of tax policy, but we have a duty to ensure that the mechanisms through which they exercise such choices comport with our constitution.

**¶40**        For the reasons set forth above, we reverse the trial court's ruling and remand for entry of judgment consistent with this opinion.

MONTGOMERY, J., joined by JUSTICE BEENE, concurred in part and dissented in part:

**¶41**　　　　We concur in the majority's determination that tax revenue measures are for "the support and maintenance of the departments of the state government and state institutions." *Supra* ¶ 1. However, we respectfully dissent from our colleagues' analysis and conclusion that permits an exemption for tax revenue measures absent compliance with all the requirements of article 4, part 1, section 1(3) of the Arizona Constitution. *Supra* ¶¶ 25–28. Instead, we would return to the understanding of the referendum power's scope as reflected in the records of the constitutional convention of 1910, the actions of the first legislature, and the earliest decisions of this Court in *Clark v. Boyce*, 20 Ariz. 544 (1919), *Orme v. Salt River Valley Water Users' Ass'n*, 25 Ariz. 324 (1923), and *Warner v. White*, 39 Ariz. 203 (1931). Accordingly, no legislative act is exempt from the referendum save specific categories of laws for specific reasons enacted in a specified manner.

**¶42**　　　　At the outset, we acknowledge the difficulty in interpreting this provision of our constitution. We thus echo the state's earliest justices in confessing that the wording of article 4, part 1, section 1 "has cost us no little trouble to arrive at a conclusion." *Clark*, 20 Ariz. at 546. Nonetheless, as noted there exists guidance among those who drafted, exercised, and interpreted the exemption from the referendum power from which we can faithfully discern an interpretation that obviates angst over the effect of the phrases "immediately necessary" and "earlier operation," avoids arbitrary distinctions between new and existing departments of state government, and renders distinctions between tax measures that ultimately raise or lower revenue irrelevant.

## I. HISTORICAL BACKGROUND

### A. Constitutional Convention and the Referendum

**¶43**　　　　The ability for the people to engage in direct democracy through initiative and referendum was at the center of the process for determining delegates to the constitutional convention. John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 32–33 (1988); *see also* Gordon Morris Bakken, *The Arizona Constitutional Convention of 1910*, 1978

Ariz. St. L.J. 1, 10 (1978). Ultimately, thirty-nine of the fifty-two delegates chosen "had pledged to support the initiative and referendum." Leshy, *supra*, at 32. And delegates reminded the convention of their pledge. Delegate Wilfred Webb stated that "candidates to this convention from Cochise county were pledged . . . to favor the Oregon plan of initiative and referendum." *The Records of the Arizona Constitutional Convention of 1910*, at 183 (John S. Goff ed., 1991) ("Goff").[5] Delegate Charles Roberts declared, "I came here standing on this progressive platform which assured the people of every county, city and town the right to use the initiative and referendum." *Id.* at 184. And Delegate Andrew Parsons read directly from the Cochise county platform, which declared:

> Believing in the ability and discretion of the people and that they are capable of self-government, and the closer the law-making power is to the people, the better the results and safer the government, we pledge our candidates for the constitutional convention to use their utmost endeavor to place in the constitution self-executing provisions for the initiative and referendum on all laws . . . substantially according to what is know [sic] as the "Oregon plan."

*Id.*

**¶44** The subject of the people's power to legislate through initiative and referendum consumed the convention more than any other subject. *See id.* at 1013–15 (indexing the various subjects addressed by delegates in the records of the convention); *see also* Leshy, *supra*, at 46; Bakken, *supra*, at 10. Discussion focused on issues concerning the extent of

---

[5] Oregon voters amended their constitution in 1902 to include Measure 1, which provided that: "the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the Legislative Assembly, and also reserve power at their own option to approve or reject at the polls any act of the Legislative Assembly." Charles A. Beard and Birl E. Shultz, *Documents on the State-Wide Initiative, Referendum, and Recall* 79–80 (1912). The only limitation to the exercise of the power was for "except as to laws necessary for the immediate preservation of the public peace, health, or safety." *Id.* at 80.

the power of initiative and referendum for cities, towns, counties, and "other municipalit[ies]," Goff, *supra*, at 176–88; the percentage of voter signatures required to place a measure on the ballot to ensure the power could be fairly exercised, *id.* at 188–89, 195–97; whether providing for the initiative and referendum violated the Enabling Act's requirement that the constitution provide for a republican form of government, *id.* at 198–208; and whether including it in the constitution would impede achieving statehood by evoking a rejection by Congress or the President, Leshy, *supra*, at 104–06.

¶45        Regardless of the sometimes heatedly stated concerns, the convention adopted a constitution providing:

> [T]he people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any act, or item, section, or part of any act, of the legislature.

Ariz. Const. art. 4, pt. 1, § 1(1).

¶46        Voters ratified the constitution overwhelmingly on February 9, 1911. *Canvass of the Returns*, Ariz. Republican, Feb. 28, 1911, at 1 (stating that 12,187 votes were cast in favor of ratification compared to the 3,822 cast against). However, due to a provision permitting the recall of judicial officers, President Taft refused to approve the constitution as drafted. William H. Taft, Special Message of the President of the United States: Returning Without Approval House Joint Resolution No. 14, H.R. Doc. No. 62-106, at 1 (1911). Voters then ratified an amendment to the constitution eliminating the recall on December 12, 1911.[6] *Phillips Is Saved from Political Disaster*: *Recall Amendment*, Ariz. Republican, Dec. 13, 1911, at 1.

---

[6]        Arizonans then amended the constitution at the very first general election on November 5, 1912, and reinstated the recall of public officials, including judges. 1913 Ariz. Sec'y of State, Ann. Rep. 23.

## B. The First Legislature

¶47        In its first sessions, the Arizona legislature enacted numerous tax measures.  To ensure exemption from referral, the legislature repeatedly complied with the provisions of section 1(3) and enacted these laws as emergency measures.  For example, in imposing a tax on telegraph and telephone companies' property, the legislature made clear that the tax measure was a law "necessary for the support and maintenance of State institutions and Departments of State."  1912 Ariz. Sess. Laws ch. 22, § 3 (1st Spec. Sess.).  The act also deemed it "necessary that said amendment should go into effect immediately," declared an emergency existed, and provided that the "Act shall be in full force and effect from and after its passage and approval by the Governor, and is hereby exempt from the operation of the Referendum provision of the State Constitution."  *Id.*

¶48        Another example from the same session concerns an act imposing taxes on real and personal property.  1912 Ariz. Sess. Laws ch. 64 (1st Spec. Sess.).  In section eight of the act, the legislature stated that the tax measure was "necessary for the support and maintenance" of state departments and institutions and declared an emergency, giving the act immediate effect and exempting it from the referendum.  *Id.* § 8; *see also* 1912 Ariz. Sess. Laws ch. 11, § 2 (Reg. Sess.) (repealing a mining tax in favor of a new property tax regime, which the legislature determined necessary to "provide funds for appropriations for the support and maintenance of the departments of State and all State institutions, and to preserve the public peace and safety," and declaring an emergency so the law had immediate effect); 1912 Ariz. Sess. Laws ch. 39, § 8 (Reg. Sess.) (invoking the "public peace, health, [or] safety" as well as the "support and maintenance" requirements to levy a new tax on private car companies, which the legislature deemed necessary "for a more equal and uniform system of assessment and apportionment of taxes, and for the efficient collection of State taxes and revenue"); 1912 Ariz. Sess. Laws ch. 23, § 3 (1st Spec. Sess.) (declaring an emergency in order that a law imposing taxes on railroad corporations "to preserve the public peace, health and safety, and for the support and maintenance of the Departments of State and State institutions" would have immediate effect); 1913 Ariz. Sess. Laws ch. 73, § 8 (3d Spec. Sess.) (declaring law imposing an annual tax on real and personal property to be "necessary for the support and maintenance of the Departments of State and State Institutions").

**¶49**     These historical examples give credence to an interpretation that section 1(3) of the Arizona Constitution only exempts specific legislative acts passed as emergency measures.  It is readily evident that the first legislature clearly understood that adhering to the requirements of section 1(3) for passing emergency measures was necessary to exempt tax revenue acts from the referendum.  The state's representatives, many of whom served at the constitutional convention, and two of whom served on the committee proposing the language of section 1(3), treated tax laws as otherwise referable.  *See Clark*, 20 Ariz. at 554–55 (giving "great weight" to "a construction of the fundamental law by members of the Legislature who were also members of the constitutional convention").  Thus, the first legislature's treatment of tax measures undermines a conclusion that support and maintenance laws are ipso facto immune from the referendum.

## C.  Early Supreme Court Decisions

**¶50**     The first case to consider section 1(3) addressed the nature of the governor's approval to exempt an emergency act from the referendum. *Clark*, 20 Ariz. at 545–46.  The Court included a justice, Albert Baker, who introduced the very provision in question at the constitutional convention. *See* Goff, *supra*, at 44, 1387 (recording that Delegate Albert Cornelius Baker introduced a proposition addressing the "Initiative and Referendum and the Recall" and later served on the Arizona Supreme Court from 1893–1897 and again from 1919–1921).  The Court characterized the case before it as a "controversy . . . as to what construction shall be placed upon sub[section] 3, § 1, of article 4."  *Clark*, 20 Ariz. at 546.  Importantly, the Court recognized that section 1(3)'s referral exemption applies only to specific types of legislative acts passed as emergency measures:

> This sub[section] of the Constitution recognizing the people as the repository of all power has provided that *all* legislative acts passed by the Legislature shall be subject to the referendum *except emergency measures*. To give the people an opportunity to invoke the referendum, if they so choose, *laws not emergent* do not go into effect at once, but become operative 90 days after the final adjournment of the Legislature. *Emergency laws* when passed according to the

forms prescribed by the Constitution, *become effective at once and prevent a referendum.*

*Id.* at 547 (emphasis added). And the Court underscored the importance of the actions of the first legislature in interpreting section 1(3) stating:

> If we had greater doubt of the correctness of the construction that we have placed upon the constitutional provisions as affecting the enactment of emergency laws, we would still feel constrained, on account of the public and private interests involved, to heed the unbroken course of conduct by the other two departments. Many of the members of the constitutional convention were members of the first and other sessions of the Legislature. The president of the constitutional convention was the Governor of the state during the sessions of 1912 and 1915.

*Id.* at 554. The Court further noted it had "indorsed the rule that a construction of the fundamental law by members of the Legislature who were also members of the constitutional convention was entitled to great weight." *Id.* at 554–55.[7]

¶**51** This Court next considered section 1(3) in *Orme.* The Court addressed the validity of a legislative act passed as an emergency measure in resolving the issues presented in the case. 25 Ariz. at 344–45. The language in question read:

> Whereas, the provisions of this act are necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, and this act is hereby exempted from the operation of the referendum provisions of the state Constitution, and shall take effect and be in full force and effect from and after its passage and its approval by the Governor.

---

[7] Justice Baker separately concurred in the opinion. *See id.* at 557–562. This surely would have been the place to correct any error in understanding the exemption of measures from the referendum.

24

*Id.* at 346. The Court acknowledged the reservation of the referendum power by the people but nonetheless observed:

> [t]his reserved power, however, does not apply to acts requiring "earlier operation to preserve the public peace, health or safety," nor to those providing "appropriations for the support and maintenance of the departments of state and of state institutions." *Enactments of this character may be made immediately effective and thus exempted from the referendum by the Legislature's stating in a separate section of the act why it is necessary and declaring the existence of an emergency.*

*Id.* at 346–47 (emphasis added). The Court ultimately found the language of the act in question sufficient to exempt it from the referendum. *Id.* at 347–48.

**¶52** In *Warner*, this Court affirmed *Clark*'s and *Orme*'s conclusion that exceptions to the referendum power are limited to specific categories of legislative acts that are explicitly identified as such and passed in a specific manner. 39 Ariz. at 213. *Warner* also addressed a provision within a larger act that appropriated monies "[t]o carry out the purposes of th[e] act." *Id.* at 207. Opponents to referral of select provisions of the act, including the appropriations provision, argued that because the sections sought to be referred included an appropriation to aid a statewide taxing effort, it was for the support and maintenance of a department of state government and therefore could not be subject to the referendum in light of section 1(3). *Id.* at 208. Proponents for referral argued that the appropriation was not for an existing department of state government but was for a newly created department, therefore the emergency provisions did not apply. *Id.* The proponents also argued, but did not press, that an appropriation for an existing department would still be subject to the referendum unless it was exempted as provided in section 1(3). *Id.*

**¶53** The *Warner* Court noted that "[t]he third clause of this sub[section,] which sets forth the condition under which emergency measures shall be considered passed by the Legislature[,] shows clearly that no act is withdrawn from the referendum ipso facto under the Constitution of this state." *Id.* at 213. The *Warner* Court further stated:

> While it is true these two classes of laws are excepted from the referendum, it will be observed that *they are not given this status merely because of their nature* or the need for their earlier operation than ninety days but because, these things being true, the Legislature, which is the judge of the question whether they should become immediately operative, recognizes this necessity, expresses it in a separate section of the act and follows this with approval by a two-thirds vote of each house; in other words, incorporates in the act the emergency clause. *In no other way may a law enacted by the Legislature of this state, regardless of its nature or the urgency for its early operation, be withdrawn from the referendum.*

*Id.* (internal citation omitted) (emphasis added).

¶54      Reasoning that the phrases "immediately necessary" and "require earlier operation" applied to each class of laws as referenced in the first and second clauses, the Court further stated that "it was the undoubted purpose of the framers of the Constitution to provide that every act passed by the Legislature should be referable unless it be a safety or support measure requiring immediate, or earlier operation than ninety days," rendering them emergency measures and eligible for exemption from the referendum. *Id.* at 214.

¶55      Fifteen years later, this Court took up another appropriations measure requiring the interpretation of section 1(3) in *Garvey v. Trew*, 64 Ariz. 342 (1946). The legislature passed the measure in question with a two-thirds vote and the governor approved it; however, it did not have an emergency clause. *Id.* at 345. The secretary of state refused to accept petitions to refer the measure to the ballot, as advised by the attorney general, on the basis that the act was for the support and maintenance of a department of state government and not subject to referendum. *Id.* at 345–46.

¶56      The *Garvey* Court expressly found that the appropriation was for the support and maintenance of a department of state government and therefore covered by section 1(3) and further went on to consider whether the emergency provisions applied. *Id.* at 347–48. In its analysis, the Court distinguished *Warner* by finding the measure it addressed "wholly

dissimilar to that existing in the present case." *Id.* at 348. Because *Warner* concluded that the measure before it was not for the support and maintenance of government, *Garvey* reasoned that the *Warner* Court had no need to address the emergency provisions of section 1(3). *Id.* at 349. *Garvey* therefore considered the *Warner* analysis of section 1(3) to be mere "obiter dicta" and, pursuant to considerations of stare decisis, dismissed it given the "grave doubt as to the correctness of the construction given to section 1(3)." *Id.* at 349–51.

**¶57** Free to interpret section 1(3) anew, *Garvey* opined:

> It is not logical to assume that the creators of these departments and institutions set up for the purpose of conducting government, intended that their functions might be disrupted for long periods by a small minority. We cannot believe that the framers of the constitution, or the voters who adopted it, intended to make it possible for a small percentage of the voters to stop the functions of the various departments of government by cutting off their appropriations through the operation of the referendum. This does not make sense.

*Id.* at 352.

**¶58** This assessment followed the point that a distinction should continue to be made between appropriations measures for new departments versus existing departments:

> We are satisfied that the framers of the constitution and the people who voted for its adoption understood and intended that appropriations for the support and maintenance of the departments of the state government and state institutions were not to be subject to the referendum. The departments of the state and its various institutions come into existence only through the majority vote of the people, or of the legislature. Where a new department of state is set up, or a new institution provided by the legislature, its creation is subject to the will of the people under the referendum unless the law is passed by a two-thirds vote, and is an emergency measure.

27

*Id.* at 351. *Garvey* categorically rejected any notion that an appropriations measure for an existing state department not passed with emergency provisions could be subjected to the referendum because "[t]he will of the majority would be defeated until such time as a vote could be taken at a general election." *Id.* at 352.

**¶59**        *Garvey* then considered section 1(3) as a whole and observed that section 1(3) has "two separate and distinct classes of acts" that are immune from referral: (1) "measures immediately necessary for the preservation of the public peace, health or safety," and (2) "measures for the support and maintenance of governmental departments and institutions." *Id.* at 353. Contrary to *Warner*, the Court determined that the "emergency measure" as used in § 1(3)'s second clause refers "only to the police power acts of a character immediately necessary to preserve the peace, etc.," and that the phrase "immediately necessary" qualifies only public health laws rather than support and maintenance laws. *Id.* Likewise, the Court concluded that the phrase "earlier operation" qualifies only acts involving the public peace, health, and safety. *Id.* at 353–54. It therefore concluded that support and maintenance laws, or at least appropriations, are categorically exempt from referral.[8] *Id.* at 354.

---

[8]        Nonetheless, the *Garvey* Court repeatedly stated that the support and maintenance laws exempt from referral are appropriation measures. *See id.* at 353 ("[M]easures for the support and maintenance of governmental departments and institutions . . . relate[] *wholly to appropriations* for support og [sic] government function." (emphasis added)); *id.* at 351 ("We are satisfied that the framers of the constitution and the people who voted for its adoption understood and intended that appropriations for the support and maintenance of the departments of the state government and state institutions were not to be subject to the referendum."); *id.* at 352 ("If an appropriation is for the support and maintenance of a department or institution, it is exempt."); *id.* at 354 ("It is, therefore, our view that measures to provide appropriations for support and maintenance are exempt from the referendum."); *id.* ("[O]nly appropriations for the support and maintenance of state departments and institutions, and those only in existence are exempt . . . .").

## II. OVERRULING *GARVEY*

**¶60**        *Garvey*'s holding that the term "emergency measures" qualifies only public health laws is not the best interpretation of the text and is undermined by the history of the constitutional convention, the practice of the first legislature, and the earliest understanding of section 1(3). We therefore reject *Garvey*'s interpretation of section 1(3) and its adoption of a categorical exemption of laws from the referendum. Instead, we would interpret section 1(3) consistent with *Clark*, *Orme,* and *Warner* to preclude categorical exemptions from the referendum and give operative effect to every provision within section 1(3) consistent with the framers' intent.

**¶61**        Before engaging in an analysis of section 1(3) and applying it as we propose, it is necessary to expressly overturn *Garvey*. Consistent with the majority's recognition of the value of stare decisis, *supra* ¶ 17, we acknowledge that the doctrine cautions against overruling previous decisions to promote "consistency, continuity, and predictability" in the law. *State ex rel. Brnovich v. Ariz. Bd. of Regents*, 250 Ariz. 127, 132 ¶ 17 (2020); *see also Galloway v. Vanderpool*, 205 Ariz. 252, 256 ¶ 16 (2003) ("[S]tare decisis . . . seeks to promote reliability so that parties can plan activities knowing what the law is."). However, stare decisis is "a doctrine of persuasion and not an iron chain of necessary conclusion," *White v. Bateman*, 89 Ariz. 110, 113 (1961) (quoting *O'Neil v. Martin*, 66 Ariz. 78, 84 (1947)), and "[t]he ease with which courts have abandoned precedent corresponds to the subject matter of the case at issue," *State v. Hickman*, 205 Ariz. 192, 201 ¶ 38 (2003).

**¶62**        Just as *Garvey* noted, "[w]here previous decisions involve only questions of public interest and which do not affect private rights (the case here) the doctrine of stare decisis is greatly relaxed. This court has not hesitated to review its prior opinions upon questions of public interest and to overrule the former holdings." 64 Ariz. at 350 (internal citations omitted). Nevertheless, "any departure from the doctrine of *stare decisis* demands special justification." *Hickman*, 205 Ariz. at 200 ¶ 37 (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). And, while this is a partial dissent, the ultimate impact on the constitutional reservation of the power of the referendum requires more than just an outline of an interpretive disagreement with *Garvey* or the majority.

**¶63**        "Ultimately, the degree of adherence demanded by a prior judicial decision depends upon its merits, and it may be abandoned if the reasons for it have ceased to exist or if it was clearly erroneous or manifestly wrong." *Lowing v. Allstate Ins.*, 176 Ariz. 101, 107 (1993). Compelling reasons to overrule precedent include: (1) the language does not compel the previous interpretation; (2) the previous interpretation did not advance the intended policies; (3) the prior decision did not result from "clear analysis or persuasive reasoning"; (4) overruling returns to a better supported and reasoned decision; and (5) the facts of the case at hand demonstrate that the previous interpretation was "imprudent and unjust." *Id.* (quoting *Wiley v. Indus. Comm'n*, 174 Ariz. 94, 103 (1993)). Each factor is present with *Garvey*.

**¶64**        First, *Garvey*'s categorical exemption of appropriations measures from the referendum, even if limited to those for currently existing state departments and institutions, *Garvey*, 64 Ariz. at 354, is not compelled by the text of section 1(3). *See infra* ¶¶ 71–82. *Garvey* read section 1(3) to limit the application of the phrases "immediately necessary" and "earlier operation" to laws regarding public peace, health, or safety. 64 Ariz. at 353–54. Therefore, *Garvey* reasoned that appropriations for support and maintenance of existing state departments and institutions could not be considered emergency measures because such "appropriations are foreseen" and do not require immediate action. *Id.* at 354.

**¶65**        But even if you read the text in this way, which we agree you should, *see infra* ¶¶ 76–79, it does not mean that support and maintenance measures are categorically exempt. Instead, it simply means that there are two distinct categories of laws that can be exempted from the referendum and that there are two different bases on which they can be exempted: if they require earlier operation to preserve the public peace, health, or safety, *or* if they are appropriations for the support and maintenance of state departments.

**¶66**        Equally problematic with the reasoning about emergency measures is that it allowed *Garvey* to make a distinction between existing and new state departments. *See Garvey*, 64 Ariz. at 346–48. If appropriations are for an existing department, they cannot be emergent and are therefore exempt. *Id.* at 354. However, if it is a new department, then it could be subject to the referendum. *Id.* at 355. This makes no sense. An

appropriation for a new department would certainly be for the support and maintenance of a state department, even if it was created in the same act. Whether the legislature determined it should pass as an emergency measure could fall under either justification of being required before the ninety-day period expires because it is needed to, say, preserve public health, or on the basis that it is an appropriation for an emergency as stated in a separate section.

¶67      Second, such an interpretation does not advance a clear intent of the framers to enshrine in the constitution the reserved power of the referendum for the people "to approve or reject at the polls any act, or item, section, or part of any act, of the legislature." Ariz. Const. art. 4, pt. 1, § 1(1). *Garvey* undermines Arizona's strong and unequivocal public policy of construing the referendum power in favor of the people, *W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 428 (1991), and utterly fails to give meaning to the entirety of section 1(3). A categorical exemption from the referendum is a categorical limitation on a power reserved by the people in section 1(1) that has no support in the historical record. *See supra* ¶¶ 41–46.

¶68      Third, the *Garvey* decision did not result from clear analysis or persuasive reasoning. The *Garvey* Court failed to fully consider the entirety of section 1(3) in the context of section 1(1). Instead, the Court established its own logic, beliefs, and self-satisfying understanding of how section 1(3) should work, *supra* ¶¶ 55–59, and wholly failed to address the historical record reflecting the framers' intent before analyzing the language in question, *see Whitman v. Moore*, 59 Ariz. 211, 218 (1942) ("Whether the attitude of the convention and the voters was wise is not for this court to say . . . ."), *overruled on other grounds by Renck v. Superior Court*, 66 Ariz. 320 (1947).

¶69      Instead, the Court merely substituted its judgment for the delegates who drafted the constitution, ran roughshod over the people who ratified it, and bolstered its holding by observing with incredulity that section 1(3) could be interpreted to give a minority such incredible power over the legislature and delay legislation. *Garvey*, 64 Ariz. at 352.

¶70      The Court failed to address the difference between a measure being subject to a referendum and the effort required to actually place one on the ballot. This distinction was important to the convention delegates

who discussed the particulars for ensuring that the mechanics of referral would not frustrate its exercise. *See supra* ¶¶ 43–44. It is also shortsighted to assume that the people will reflexively place every measure without an emergency clause on the ballot. Such a dismissive understanding of the nature and role of the referendum as the framers sought to preserve it is not entitled to continued reliance.

**¶71** Fourth, overturning *Garvey* would return this Court to a consistent understanding of the scope of measures exempt from the referendum as discussed in *Warner*. *Warner*'s overall rationale gives effect to each clause of section 1(3) and adheres to the legislative intent as evidenced by the constitutional convention and first legislature's enactments. Rather than dismissing *Warner*'s analysis as "obiter dicta," we should embrace it with the exceptions discussed below. *Infra* ¶ 77; *see Garvey*, 64 Ariz. at 350.

**¶72** Fifth, the holding of *Garvey* as applied to the facts of this case renders one more subset of measures, tax revenue measures, wholly exempt from the referendum without the need to comply with the emergency measures otherwise proscribed by section 1(3). Accordingly, *Garvey*'s "interpretation . . . was 'imprudent and unjust.'" *Lowing*, 176 Ariz. at 107 (quoting *Wiley*, 174 Ariz. at 103).

**¶73** *Garvey* is in error and should be overruled. Although this Court has "a strong respect for precedent, this respect is a reasonable one which balks at the perpetuation of error, and the doctrine of stare decisis should not prevail when a departure therefrom is necessary to avoid the perpetuation of pernicious error." *Garvey*, 64 Ariz. at 350 (quoting *State ex rel. La Prade v. Cox*, 43 Ariz. 174, 183 (1934)); *see also Lowing*, 176 Ariz. at 108 ("[A]lthough we have a healthy respect for stare decisis, we will not be bound by a rule with nothing more than precedent to recommend it.").

## III.  ANALYSIS OF SECTION 1(3)

**¶74** We now turn to a more appropriate interpretation of section 1(3) and its application to the measure before us. To facilitate the application of the entirety of section 1(3), we view it as consisting of three distinct clauses, each separated by a semicolon and working together to address the what, why, and how of excluding specific legislative acts from

the referendum. We can readily identify which legislative acts pass constitutional muster for exemption from a referendum while faithfully protecting the power of referendum retained by the people of Arizona by considering the following questions: (1) what type of law has the legislature passed? (2) why is it necessary for the law to go into immediate effect? and (3) how was the law passed?

## A. What can be exempted?

¶75 The first clause of section 1(3) begins by providing that "[u]nder [the referendum] power . . . five per centum of the qualified electors . . . may order the submission to the people at the polls . . . any measure, or item, section, or part of any measure, enacted by the legislature." The rest of the clause then identifies two distinct categories of laws that may not be subject to the people's exercise of the referendum power as exceptions: (1) "laws *immediately necessary* for the preservation of the public peace, health, or safety, or" (2) "for the support and maintenance of the departments of the state government and state institutions." (Emphasis added.).

¶76 At this point, *Warner* and *Garvey* struggled to understand the effect of the phrase "immediately necessary" in discerning the nature of the two categories of laws that could be exempt from the referendum and engaged in differing interpretive methods. *Warner*, 39 Ariz. at 213–14; *Garvey*, 64 Ariz. at 353. However, a plain reading of the first clause in context of the entirety of section 1(3) obviates a need to discern whether "immediately necessary" applies to support and maintenance measures. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) (describing the whole-text canon and noting "[t]he entirety of the document thus provides the context for each of its parts").

¶77 When read in conjunction with the second clause, it is not necessary to engage in further interpretation to discern the phrase's application to support and maintenance laws. It can, and should, be read as only characteristic of laws for public peace, health, or safety. But this does not mean that support and maintenance measures are categorically exempt from the referendum.

### B. Why may laws be exempt?

**¶78**    The second clause generally requires that legislative acts do not become operative until ninety days after the close of the legislative session to preserve the exercise of the referendum power with two exceptions that otherwise permit laws to go into immediate effect.[9]  Ariz. Const. art. 4, pt. 1, § 1(3).  Thus, the second clause logically follows the first in providing a rationale for why specific categories of laws identified in the first may be exempt from a referendum.

**¶79**    Reading the two clauses together for the first category of laws provides that "laws immediately necessary for the preservation of the public peace, health, or safety" may be exempt from the referendum *because* they "require earlier operation to preserve the public peace, health, or safety."  Similarly, reading the two clauses together for the second category provides that laws "for the support and maintenance of the departments of the state government and state institutions" may be exempt when they "provide appropriations for the support and maintenance of the departments of the state and of state institutions."

**¶80**    Because we read the text as it is, we disavow *Warner*'s analysis that concluded "immediately necessary" and "earlier operation" applied to both categories of laws.  *Warner*, 39 Ariz. at 211–12.  It is not necessary to apply either phrase to both categories of laws to give proper effect to section 1(3), though we agree with *Warner*'s conclusion concerning the import of the second clause.  *Id.* at 212 ("[T]he second clause permits the two classes of measures the first clause exempts from the referendum to become operative earlier than other laws, provided the preservation of the public peace, health or safety or the financial needs of the state's departments and institutions require it."); *see also Orme*, 25 Ariz. at 346 ("This reserved power . . . does not apply to acts requiring 'earlier operation to preserve the

---

[9]    The majority's conclusion that the reason for the ninety-day waiting period is to "allow[] citizens an opportunity to evaluate and challenge whether the measure is truly for the 'support and maintenance' of the existing departments of the state and state institutions, as some revenue measures may not fall into this category," *supra* ¶ 25, is true for citizens to consider *any act* not exempted in order "to allow opportunity for referendum petitions," Ariz. Const. art. 4, pt. 1, § 1(3).

public peace, health or safety,' nor to those providing 'appropriations for the support and maintenance of the departments of state and of state institutions.' [E]nactments of this character may be made immediately effective and thus exempted from the referendum . . . .").

¶81 Importantly, though, there is nothing restrictive in the second clause that would prevent its application to either category of laws. For example, the legislature could enact a measure for the preservation of public health that was immediately necessary and justify it as exempt because it was an appropriation for the support and maintenance of the Department of Health Services. Monies appropriated for pandemic operations could be one such possibility.

¶82 Likewise, there is nothing that would prevent the legislature from identifying a tax revenue measure for the support and maintenance of a department of state that "require[d] earlier operation to preserve the public peace, health, or safety." In fact, the first legislature did just that with an act imposing a tax to fund the State Tax Commission. 1912 Ariz. Sess. Laws ch. 39, § 8 (Reg. Sess.). The justification set forth was that "the provisions of th[e] Act are necessary to the public peace, health, safety, and for the support and maintenance of the departments of State government and State institutions . . . ." *Id.*

¶83 This interpretation of the first two clauses of section 1(3) provides the means by which the legislature, and thereby state government, may operate quickly when called for without unduly restricting the people's retained power of the referendum. It also serves to obviate the need to parse the effects of "immediately necessary" and "earlier operation," and avoids the need to determine whether revenues are going to go up or down if the measure is otherwise required for the preservation of the public peace, health, or safety. Otherwise, "any act, or item, section, or part of any act, of the legislature," remains subject to the people's exercise of the power of the referendum subject to following the requirements of the third clause. Ariz. Const. art. 4, pt. 1, § 1(1).

### C. How may laws be exempted from a referendum?

¶84 The last clause of section 1(3) addresses the mechanics for ensuring immediate effect of laws falling into one of the two categories in

clause one, determined by clause two to necessitate early operation for public peace, health, or safety, or which are an appropriation for the support and maintenance of the departments of the state. To pass as an emergency measure, such laws must receive a two-thirds approval in both the House and Senate via a roll call vote, contain a separate section stating the necessity of the law, and must receive the governor's approval. Ariz. Const. art. 4, pt. 1, § 1(3); *see also Clark*, 20 Ariz. at 547–48 (holding that gubernatorial approval does not require a governor's signature).

¶85 Thus, the limitations, exceptions, and extra steps necessary to exempt a legislative act from the referendum pursuant to section 1(3) all protect the people's exercise of the referendum power. As this Court wrote in *Warner*, "every act passed by the Legislature should be referable unless it be a safety or support measure requiring immediate, or earlier operation," and even then, "only when the Legislature states this necessity in a separate section and passes the measure by a two-thirds vote," along with receiving gubernatorial approval. 39 Ariz. at 214; *see also id.* ("[T]here is no such thing under the Constitution of this state as an act being ipso facto withheld from or in no event subject to the referendum.").

## IV. APPLICATION TO SB 1828

¶86 As a tax revenue measure, SB 1828 qualifies as a law for support and maintenance of a state department or institution. *See supra* ¶ 1. It is therefore eligible for exemption from the referendum if the legislature has properly identified it as an emergency measure and enacted it accordingly, which it did not. Although it received the governor's approval, it does not contain a separate section stating why such a law is necessary and did not receive a two-thirds vote by roll call in either the House or Senate. *Fifty-Fifth Legislature – First Regular Session Bill Status Inquiry: SB1828*, Ariz. Legislature, https://apps.azleg.gov/BillStatus/BillOverview/76142 (last visited Aug. 15, 2022) (documenting the bill's passage by a 16-14 vote in the Senate and a 31-29 vote in the House).

¶87 Therefore, we would affirm the trial court, though not due to the nature of the measure but because the measure does not comply with the requirements of section 1(3).